THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN SMITH, Defendant-Appellant.

First District (3rd Division)  No. 1—91—1639

Opinion filed December 22, 1993.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Michael Slovis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

After a bench trial, defendant Kevin Smith was convicted of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) and sentenced to serve 30 years' imprisonment. Defendant appeals from the judgment of conviction pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons which follow, we affirm.

FACTUAL BACKGROUND

The following pertinent facts were adduced at trial. Defendant lived at 5560 West Quincy Street in Chicago with his grandmother,

Mickey Smith (Mickey); his brother, Keenan Smith (Keenan); the victim, Cora Davis; and the victim's six-year-old son, Melvin Davis (Melvin). On March 6, 1989, defendant and his girlfriend, Marilyn Hicks, spent most of the day at defendant's home. At about 10 p.m., defendant and Hicks walked to a restaurant and then to a bus stop where Hicks boarded a bus. At that time, defendant was wearing a gray and white sweatshirt with black designs on it. Defendant then went to the corner of Madison Street and Parkside Avenue, where he met Ricky Adams. Subsequently, the two men went to Kendall Williams' house at 5550 West Quincy Street.

Defendant told Detective Mark Sanders of the Chicago police department that he remained at Williams' house for about one-half hour and returned home to obtain cocaine for himself and his friends even though he had no money with which to purchase the cocaine. Defendant told Detective Sanders that he knew there would be cocaine at his home as both Mickey and the victim were drug dealers.

Upon entering his home, defendant noticed that the only lighted room was the kitchen located at the rear of the apartment. While walking to the kitchen, defendant observed that Keenan, Mickey and Melvin were sleeping. The victim was in the kitchen. At trial, the victim's niece, Tamika Jackson, recounted that at around 3:30 a.m. she telephoned the apartment from the Cook County jail, and defendant spoke to her. After speaking to Jackson, defendant passed the telephone to the victim. Jackson stated that she then heard defendant and the victim argue about drugs for a few minutes. Finally, the victim told defendant to "put her shit down." Defendant's response to this directive was "Fuck you." The victim then got back on the line and told Jackson to call her back later.

Jackson testified that she called back the apartment five minutes later after being fingerprinted and Mickey told her that the victim was dead. However, Detective Hugh Conwell of the Chicago police department testified that the process of fingerprinting an individual takes approximately 20 minutes.

At trial, Melvin testified that during the night in question that he was awakened by the sound of defendant and the victim arguing. Subsequently, Melvin then went to the bathroom and then the victim told him to go back to bed. Defendant and the victim then resumed their altercation. Melvin recounted that the victim told defendant to "put down her stuff" to which defendant retorted "fuck you." Melvin stated that he then returned to bed. When he awoke later, there was blood in the hallway and the police were at the apartment.

At approximately 5 a.m., on March 7, 1989, Detectives Lawrence Poli and John Dolan of the Chicago police department observed in

defendant's bedroom the victim's body lying on her back between the bed and dresser. The victim's brassiere and sweatshirt were raised above her breasts and her slacks and panties were pulled down to just above the knees. The body was lying on a blood-soaked sheet. A bloody gray and white sweatshirt with black designs on it was found near the victim's head. The police retrieved a large kitchen knife from underneath the victim's body and photographed sanguinary partial footprints near defendant's bedroom. Additionally, drug paraphernalia was discovered throughout the apartment. The victim's death was attributable to five stab wounds and two puncture wounds to the chest.

At around 5:30 a.m., defendant entered the apartment and was arrested. Police officers removed defendant's shoes, socks and jacket for evidentiary purposes.

On March 8, 1989, Detective Poli returned to the unsecured crime scene and recovered the bloody sheet and sweatshirt from a garbage can. Defendant's uncle, Byron Smith, had thrown the objects out earlier in the day. No evidence was presented as to why the Chicago police failed to secure the crime scene when the body was discovered.

Robert Berk, a trace evidence analyst for the Chicago police department's crime laboratory, determined that a hair that could have originated from the victim's body was present on defendant's jacket.

Kristen Braun, a serologist for the Chicago police department, concluded that the blood on the kitchen knife matched the victim's blood type and that defendant's socks and shoes also contained blood.

Officer Alfred Klaeszer, an evidence technician for the Chicago police department, testified that defendant's shoe matched the bloodstained partial footprint found by police in the hallway outside of defendant's bedroom on the night of the slaying. Officer Klaeszer stated that the tread on the sole of defendant's shoe was unique in that part of its heel was missing.

Defendant and Adams testified that defendant remained at Williams' residence until 3:15 a.m. when he left to return home. Defendant stated he went home to retrieve some cigarettes and to put away a bag of cocaine that Adams had given him. Defendant recounted that when he arrived home, he found everyone there asleep except the victim, who was in the kitchen "getting high." Defendant proceeded to the kitchen, where he heated some cocaine in a tube over the stove in order to prepare it for consumption. According to defendant, he then went to the kitchen and split the prepared cocaine into two piles, one for himself and the other for the victim. At about 3:25 a.m., the telephone rang and defendant answered it and the

party on the other end was Jackson. Defendant said hello to Jackson and then handed the telephone to the victim. Defendant narrated that he then went back to his pile of cocaine and cut it into a thin line which he mixed with tobacco that he had emptied out of one of his cigarettes. Defendant then mixed the cocaine from the victim's pile into the mixture. Defendant said that the victim then accused him of taking her cocaine to which he replied "I ain't did none." He then finished mixing his cocaine with the tobacco and departed.

Once out of the house, defendant related that an acquaintance named Mike drove up alongside him in an automobile. The two men conversed for approximately 10 to 15 seconds and then defendant got into the car and drove with Mike to the intersection of Jackson Street and Lotus Street in Chicago. Defendant testified that he subsequently went home after about 10 to 15 minutes.

Defendant stated that upon his return to the apartment, he turned on the light in the dining room and everyone in the household was asleep; however, the victim was not at home. According to defendant, he then asked Mickey where the victim was, to which she replied that she did not know. Defendant stated that he then made a quick telephone call from the kitchen and left the room.

Defendant asserts that he then went back out with Mike in his car and did not return home until after 5 a.m. It was at that time that defendant went into the apartment and found all the lights on. Keenan told defendant that the victim was dead in defendant's bedroom. Defendant said he then went to view the scene and was told by Mickey to search the victim's body for drugs or money. Defendant stated that he did not find anything on the body and did not disrobe it. Defendant recounted that he became afraid and left the apartment. When defendant returned, the police were at the scene and placed him under arrest.

Mickey testified that she was awakened by Keenan's alarm clock at around 5 a.m. Mickey stated that she did not get up during the night as "it was so quiet that you could hear a cat snoring." Mickey denied ever speaking on the telephone to Jackson and informing her of the victim's death. Mickey further stated that upon her first view of the victim's body, it was fully clothed. According to Mickey, after defendant searched the body for drugs, she alerted the police to the situation.

## ISSUE PRESENTED FOR REVIEW

On appeal, defendant argues that his conviction for first degree murder must be reversed as the State failed to prove him guilty beyond a reasonable doubt.

## OPINION

Defendant contends that he was not proven guilty beyond a reasonable doubt because the evidence against him was entirely circumstantial and came from doubtful sources. Defendant submits that any number of suspects could have killed the victim because, as a drug dealer, she had numerous patrons coming in and out of the apartment at all hours of the day and night. Defendant also asserts that the testimony of many of the witnesses was clearly not credible, and the physical evidence was inconclusive. Specifically, defendant charges that the serological evidence from his shoes indicating an unknown blood type and undetermined age of the blood, coupled with the fact that he had no blood on any part of his body or clothing at the time of his arrest, did not constitute evidence of guilt beyond a reasonable doubt. Furthermore, defendant claims that the sweatshirt found next to the body proved nothing because both defendant and Hicks testified that he changed shirts after they had engaged in sexual intercourse at 10:30 p.m. on the night of the slaying. Finally, defendant argues that his footprint near the body was explained by the testimony of defendant and Mickey that defendant searched the victim's body for drugs.

On appeal, when confronted with a challenge to the sufficiency of the evidence, the relevant inquiry for a court of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) A reviewing court applies this standard regardless of whether the evidence is direct or circumstantial. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Where the evidence produced by the prosecution is circumstantial in nature, the State is not obligated to exclude every reasonable hypothesis of innocence. (*People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.) The appellate court is not permitted to substitute its judgment for that of the fact finder on questions involving the weight to be assigned evidence or the credibility of witnesses. (*People v. Campbell* (1992), 146 Ill. 2d 363, 586 N.E.2d 1261.) Accordingly, this court will not disturb a judgment of conviction unless the evidence presented at trial is so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation]." *Campbell*, 146 Ill. 2d at 375.

In the case *sub judice*, it was admitted by defendant that he had argued with the victim about cocaine a short time prior to her death. The victim was killed in defendant's bedroom and defendant's shoes, socks and sweatshirt had blood on them. A bloody footprint found in the hall near defendant's bedroom matched defendant's shoe print.

Jackson testified that she spoke with defendant and the victim at 3:30 a.m. After being fingerprinted, she telephoned the apartment again and was told by Mickey that the victim was dead. Although there were some inconsistencies in Jackson's testimony and Mickey denied ever talking to her, the resolution of such inconsistencies was wholly within the province of the trial court, and we decline to substitute our judgment for that of the trial judge. (See *People v. Phillips* (1989), 127 Ill. 2d 499, 538 N.E.2d 500.) The testimony of Detective Conwell indicated that Jackson could not have called the victim a second time in less than 20 minutes. In any event, Jackson's testimony, which the trial court found credible, established that her second call occurred anywhere from 5 minutes to 30 minutes after the first call, well within the time the murder occurred. Defendant had the motive to kill the victim and was the only person who could have done so that night. Thus, we find that after reviewing the evidence in a light most favorable to the prosecution, the State proved beyond a reasonable doubt that defendant murdered Cora Davis.

DISPOSITION

In light of the foregoing, the judgment of conviction entered by the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI and GREIMAN, JJ., concur.