THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. M.C. ELLIS, Defendant-Appellant.

First District (3rd Division)    No. 1—92—0894

Opinion filed February 8, 1995.

Daniel P. Albers, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Carlos Velez, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

After a bench trial, defendant, M.C. Ellis, was convicted of the first degree murder of James Terrell (hereinafter James) in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1) (now 720 ILCS 5/9—1(a)(1) (West 1992))) and sentenced to a prison term of 30 years for that crime. It is from the judgment of conviction that defendant now appeals to this court pursuant to section 6 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

Ortario Terrell (hereinafter Ortario) testified at trial to the following. On July 16, 1991, at about 11:30 p.m., he was at the intersection of Frontage Road and 130th Street in Chicago, where his cousin Clifton Johnson (hereinafter Clifton) was involved in a drag race with Tom Davis. Ortario had wagered $85 with defendant that Clifton would win a drag race with Davis. Clifton won the race and Ortario was paid the $85.

After the race, Ortario and his cousin James drove to their house located at 218 West 110th Street in Chicago. At the house Ortario had a verbal altercation with defendant and codefendant Robert De-Berry. Ortario then left the residence but later returned at about 2:30 a.m. the next day. At this point, Ortario had assembled at the house his cousins James, Jackie Terrell (hereinafter Jackie), and Ronnie Terrell (hereinafter Ronnie).

While Ortario was speaking with James, defendant drove to the house in a white Buick Park Avenue, jumped out of the car with De-Berry and told Ortario he wanted the money back. Moments later, codefendant Cedric Parks arrived in his white Cadillac. Parks stood off to the side while defendant struck his automobile, again stating that he wanted his money back. Defendant then told DeBerry to get his gun. Ortario started walking towards his grandmother's home to call the police and turned and saw Parks with a revolver in his hand. When Ortario made it to the top of the stairs at his grandmother's home, he heard gunshots and called the Chicago police.

Clifton testified at trial as following. He admitted that on July 16, 1991, he engaged in a drag race against a man named Tom. After the race, Clifton and his cousins went to the house at 218 West 110th Street. Clifton then left to go buy beer, and en route to a liquor store, a white car began tailgating his car. Clifton eventually eluded the white car and decided not to get the beer but rather proceeded to his mother's home located at 84th Street and Cregier Avenue. Clifton recounted that at approximately 2:30 a.m., he left his mother's residence and went to his grandmother's house at 218 West 110th Street. James, Ortario, Ronnie, Willie Terrell (hereinafter Willie), Walter Flowers and Bernard Johnson (hereinafter Bernard) were all present.

As the group sat around and talked, Clifton saw defendant and DeBerry pull up in a white Buick Park Avenue, the same white car that had chased him earlier. Defendant and DeBerry got out of the car with defendant screaming at Ortario that he wanted his money back. Shortly thereafter, Parks pulled up in his Cadillac, got out of

the car carrying a revolver and began menacing people with it. Clifton recalled Willie and Ronnie saying that the situation was not so serious as to need involving a gun. Whereupon, Parks put the gun to Ronnie's head and said "it ain't that serious." Parks then walked up to Willie, put the gun to his head and said "I'm going to show you how serious it is."

Clifton started to move away and heard a gunshot. He then saw Parks, Willie and James scuffling. Clifton heard defendant tell DeBerry to get his gun. The tussle continued. Clifton saw Parks throw Willie off himself and James hold onto Parks. DeBerry was kicking James during this time. Defendant then went to his car and returned to the scene with a gun. Clifton stated that defendant then shot twice towards the ground where James was lying on his stomach while saying, "Now motherfucker." During this time Parks was returning to his car. Defendant and DeBerry then returned to their car and as they drove off, Clifton heard more shots.

As defendant and DeBerry fled the scene, Willie shot at their car with a gun he had taken from Parks during the fight. Prior to that point in time, no one other than members of defendant's group were armed.

Jackie testified at trial as following. On July 16, 1991, she was watching television at 218 West 110th Street when, at about 11 p.m., she heard a commotion. She stepped outside of the house and saw defendant and DeBerry arguing with James and Ronnie about a drag race. Defendant was saying that Clifton had cheated and that he wanted his money back. James denied that Clifton had cheated. Whereupon, DeBerry shoved James. According to Jackie, after defendant was pushed he went to his car and returned brandishing two firearms. Ronnie then picked up a stick and positioned himself to swing it. DeBerry walked over to defendant and talked with him. After their brief conversation, defendant then walked out into the street and shot one of the guns into the ground twice. DeBerry then took the two guns away from defendant and placed them into the car.

After this scene, Ronnie went over to defendant, they conversed for a few moments and appeared to have resolved the situation. Jackie returned to the house and resumed watching television.

Later, Jackie heard more commotion, returned to the porch and saw defendant, Parks, DeBerry, James, Willie and Ronnie. Parks had a gun pointed at Willie's head. Ronnie stated that "It wasn't serious." Parks then turned, pointed the gun at Ronnie's head and said "I will show you how serious it is." Parks then pushed Ronnie, who then ran off. At this time James was in front of the house.

A melee between Parks and Willie ensued over the gun and it

discharged into the air. James went over to Parks and Willie, and Parks shot at James. James grabbed Parks and Willie, and the three men fell to the ground.

While the three men were struggling on the ground, Jackie heard two more shots. Parks and Willie, who were still fighting over the gun, stood up without James. Defendant then walked up to where James was lying, shot him in the back twice and said "Now motherfucker." Jackie did not see where defendant got the gun.

Later, Jackie found a black pistol lying near a fence, which she turned over to the police. Jackie was not sure where Clifton or Bernard was when the shooting occurred.

Bernard testified to the following. He arrived at 218 West 110th Street around 1 p.m. on July 17, 1991. There he saw his brother Ortario, Jackie, Ronnie, Willie and Clifton. After about one-half hour, defendant and DeBerry pulled up to the house and got out of the car. Parks then pulled up and alighted from his white Cadillac. Defendant then informed those assembled there that he wanted his "motherfucking money back" while Parks menaced the crowd with his pistol. Parks had a gun pointed at Willie's head. Ronnie stated that "it wasn't that serious." Parks then turned, pointed the gun at Ronnie's head and said "I will show you serious." Parks then returned to Willie and placed the revolver to his head.

At this point James got off the porch and walked toward Parks, who shot him. James fell on top of Parks and Willie. A struggle ensued among the three men for the gun.

Bernard heard defendant tell DeBerry to get his gun and then saw defendant with a gun. DeBerry started kicking James. Bernard next saw Parks' handgun fly over the fence and then saw defendant shoot his gun twice at James. Defendant, DeBerry and Parks fled to their cars and left. As defendant departed, he fired more shots from his car. Bernard testified that none of his relatives had a gun.

Officer Lisa Thoren of the Chicago police department testified that she went to Roseland Hospital around 4 a.m. on July 17, 1991, where she saw DeBerry, who told her that he had been shot on the left side of his body as he walked down State Street. As she was speaking to DeBerry, she heard a radio call of shots being fired at 218 West 110th Street. Parks then entered the hospital and demanded treatment for a gunshot wound to the hand. Officer Thoren then heard a radio call of other men shot at 218 West 110th Street and proceeded to the address. After speaking with a witness, she called back Roseland Hospital and told other officers to place Parks under arrest.

Dr. Kirscher, an expert in forensic pathology, performed an

autopsy on James' body and found two gunshot entrance wounds to the back and no evidence of close-range firing, which is defined as within two feet. James was 30 years old, 5 feet 8 inches tall and weighed 200 pounds.

Defendant testified on his own behalf at trial as follows. With regard to the drag race, defendant admitted to having participated in it. However, defendant denied ever demanding his money back as the person holding the bet for him and Ortario never gave the money to anyone following the race because Davis had cheated. Defendant thought Davis had cheated because he smelled nitrous oxide, a gas which is used to increase an automobile's performance during a drag race. Defendant stated that he went to 218 West 110th Street on two occasions following the race.

Defendant said that the first time he and DeBerry went to 218 West 110th Street, he did talk to Ortario but did not argue. However, DeBerry did argue with someone. Defendant denied ever having drawn a gun on this trip. Defendant and DeBerry asked Clifton if they could check under his hood for nitrous oxide. Defendant and De-Berry followed Clifton for a while before he lost them. Defendant stated that he had spent no more than 20 minutes in front of the house on his first visit.

Defendant stated that his second visit occurred on July 17, 1991, at around 2:30 a.m. or 3 a.m., while he was on West 110th Street driving DeBerry home, when he saw Parks' car parked near a crowd of people, none of whom he knew. Defendant stopped his car and De-Berry jumped out, went over to the crowd and kicked a man on the top of a pile, telling him to get off. Then a man came up from the pile and shot DeBerry. DeBerry grabbed his side and held the man down. Defendant then grabbed his gun, got out of his car, went over to the fracas and shot twice. Defendant testified that he believed the person he shot was going to kill Parks because that person had just shot his friend DeBerry. Defendant further testified that he did not see the gun the man he shot had. Rather, he saw something black in his hands which looked similar to a gun placed in evidence. Defendant stated that he had no grievance with the man he had shot and that he did not know him. One of the Terrells shot at him as he left the scene.

The trial judge found defendant guilty of first degree murder and sentenced him to 30 years' imprisonment.

## ISSUE PRESENTED FOR REVIEW

On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. Alternatively, defendant argues

that if he was guilty of anything, it was only second degree murder as he subjectively believed that he needed to use deadly force to defend Parks. We disagree with both contentions.

## OPINION

Defendant contends that his killing of James was justifiable because he believed that Willie and James were going to kill Parks and DeBerry. The defense of justifiable use of force is an affirmative defense (Ill. Rev. Stat. 1991, ch. 38, par. 7—14 (now 720 ILCS 5/7—14 (West 1992))) and, therefore, once the issue is raised by a defendant, the State has the burden of proving beyond a reasonable doubt, in addition to the elements of the offense, that the defendant was not justified in his use of force (Ill. Rev. Stat. 1991, ch. 38, par. 3—2 (now 720 ILCS 5/3—2 (West 1992))).

"[W]hen confronted with a challenge to the sufficiency of the evidence, the relevant inquiry for a court of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." (*People v. Smith* (1993), 257 Ill. App. 3d 174, 178; see also *People v. Denton* (1994), 264 Ill. App. 3d 793.) The appellate court will not retry a defendant. In a bench trial, credibility determinations of witnesses and the weight to be assessed their testimony, as well as all reasonable inferences to be drawn from them, are all within the province of the trial court. (*People v. McGrath* (1989), 193 Ill. App. 3d 12, 28.) Thus, the trial court is not required to accept the exculpatory testimony of a defendant; rather, the court must consider that testimony along with all of the evidence in the case to assess the plausibility of a defendant's testimony. *People v. Crespo* (1983), 118 Ill. App. 3d 815, 818-19.

Section 7—1 of the Criminal Code of 1961, in which the general rule regarding defense of another is found, provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1991, ch. 38, par. 7—1 (now 720 ILCS 5/7—1 (West 1992)).

In *People v. Balfour* (1986), 148 Ill. App. 3d 215, this court spoke specifically to the affirmative defense of defense of another and summarized it as follows:

> "The use of deadly force in defense of the person is justified

where (1) force is threatened against the person, (2) the person threatened is not the aggressor, (3) the danger of harm is imminent, (4) the force threatened is unlawful and (5) the person threatened actually believes that a danger exists, that the use of force is necessary to avert the danger, that the kind and amount of force used are necessary and that such beliefs are reasonable." *Balfour*, 148 Ill. App. 3d at 221.

■ In the case *sub judice*, the fact defendant contended to have acted in defense of Parks and DeBerry and testified to his version of the slaying is insufficient to elevate his claim to the level of reasonable doubt. The trial court found that defendant, Parks and DeBerry were the aggressors in this case, starting a deadly fight over a bet. We see nothing in the record that will disabuse us of the notion that both defendant and Parks came to the house on 110th Street with guns and planned to use them. Moreover, even if we were to accept defendant's version of the events of July 16 and 17, 1991, there is still no evidence that James had a gun. Consequently, the use of deadly force was far from reasonable in this case.

Alternatively, defendant urges that he satisfied his burden under section 9—2(a)(2) of the Criminal Code of 1961, which reduces a first degree murder conviction to second degree if a defendant can prove by a preponderance of the evidence that "[a]t the time of the killing he believe[d] the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in [section 7—1 of the Criminal Code of 1961], but his belief is unreasonable." Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a)(2) (now 720 ILCS 5/9—2(a)(2) (West 1992)).

■ Here, again the evidence does not show that defendant had a belief, reasonable or otherwise, that he needed to shoot James to defend Parks. The evidence shows the only reason defendant was involved in this altercation was in retaliation for losing a bet. Moreover, the evidence demonstrates that James was involved in this dispute only to try to break up the fight. No one placed James with a weapon and although defendant testified that "a dude raised up and shot DeBerry," defendant did not indicate at trial who this "dude" might be. Accordingly, defendant's conviction for first degree murder must be affirmed.

In light of the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.