THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICKY WHITE, Defendant-Appellant.

First District (5th Division)   No. 1—87—0952

Opinion filed November 27, 1989.

Randolph N. Stone, Public Defender, of Chicago (Thomas N. Swital, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Maureen Harton, and Matthew E. Coghlan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial, defendant was convicted of residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)) and sentenced to 25 years' imprisonment. On appeal, he argues that: (1) his constitutional right to confront witnesses against him was violated by the State's use of prejudicial hearsay testimony; (2) he was denied a fair trial as a result of the State's improper and inflammatory arguments to the jury; (3) the trial court erred in refusing to give his proposed jury in-

struction regarding eyewitness identification testimony; and (4) the sentence imposed is excessive. For the reasons set forth below, we affirm.

The evidence at trial established the following. On June 8, 1986, Donald Williams' home was burglarized. The home is a three-story brick house with a finished basement and side driveway located at 4940 South Woodlawn Avenue in Chicago. At the time of the burglary, Williams' wife, Mary, their daughter, Linda, and three tenants resided in the home. At approximately 6:15 a.m. Williams woke up and, as he was walking past a vacant bedroom used by his son on occasion, he noticed some drawers had been pulled out of the dresser and the contents therein strewn about. Williams returned to his bedroom and awakened his wife. They went downstairs and noticed that the front hall closet was open and several items of clothing were strewn about the floor. Thereafter, they went into their TV room, found a window wide open and discovered that their 19-inch television, which had been sitting on a table in front of the window, was missing. They then went back upstairs to the second floor, awakened their daughter, and the three of them went through the house again, eventually going to the basement family room. There they saw that a window had been broken and that a 13-inch black television was missing. They walked back upstairs to the first floor, Mr. Williams proceeded to the second floor to get dressed and to call the police, and Mrs. Williams and her daughter went to the television room on the first floor.

As the two women stood talking and looking out of the first-floor window, Mrs. Williams saw a man, later identified as defendant, walk up the driveway from the west carrying the black television taken from her home. As defendant continued down the driveway, Mrs. Williams said, "There he is" to Linda, and the two women watched defendant walk approximately 50 feet down the driveway. After losing sight of defendant when he reached some bushes at the front of the house, the women ran upstairs to the master bedroom. Linda called out to her father, "He is here. We see him. He is in the driveway." Linda and Mrs. Williams continued to watch defendant from the bedroom window. Mr. Williams called the police and gave them a description of defendant as related to him by Linda.

As defendant continued walking toward the front of the house, carrying the television, he met a young black woman wearing blue jeans, a blue jean jacket and a red sweatshirt. They crossed the street and walked behind a parked van. Shortly thereafter Linda and Mrs. Williams saw the woman emerge from behind the van and walk away from the area. Linda testified that she did not see defendant emerge

from behind the van and that her view of the driveway between two houses on the east side of the street was obstructed by the van. Approximately five minutes later, Sergeant Swain, a Chicago police officer, arrived at the Williams home, had a conversation with them, and then left. A short time later, he returned, followed by a second squad car. Inside the second car was a black woman whom Linda and Mrs. Williams both identified as the woman they had seen earlier with defendant.

Officer Swain testified that on June 8, 1986, at approximately 6:30 a.m., he was on routine patrol in his squad car when he observed a black female standing by some trash cans near 4940 South Woodlawn Avenue. She was wearing blue jeans, a blue jean jacket and a red sweater. Swain questioned the woman briefly because it was unusual to see someone out at that time of the morning. Swain then drove off and a minute later he received a radio call concerning a burglary at 4940 South Woodlawn. He returned to that address and, while speaking with the Williamses, he received a second radio call and proceeded to 50th and Kimbark, approximately 1½ blocks away from the Williams residence. Upon his arrival, he observed University of Chicago police and Chicago police officer Renard Jackson with a black female, whom Swain recognized as the woman he had previously talked to in front of the Williams home. Thereafter, Swain drove back to the Williams home, followed by Officer Jackson, who had placed the woman in his squad car. Mrs. Williams and her daughter subsequently identified the woman, Azalee James, as the person they had seen with defendant. She was then placed in custody, "Mirandized," and taken to the 21st District police station.

Detective Patrick Rooney of the Chicago police department testified that he was assigned to investigate the burglary of the Williams home. He interviewed Linda and Donald Williams and Azalee James at the police station. He told James that she was under arrest for residential burglary and advised her of her constitutional rights. (James was subsequently released, and neither the State nor the defendant called her as a witness at trial.) After receiving information from James, Officer Rooney went to defendant's residence, arriving there at approximately 10 a.m. Defendant was not at home so Rooney left a message with defendant's mother to have defendant call him. At 2 p.m., defendant called Rooney, he agreed to voluntarily come into the police station to talk with Rooney, and Rooney went to defendant's house and brought him to Area 1 police headquarters.

At Area 1, defendant was advised of his constitutional rights and informed that the police were investigating a burglary at 4940 South

Woodlawn. Defendant denied any knowledge of the burglary, stating that at the time of the incident he was drinking at a disco until 5 a.m. and that he arrived home at approximately 6 a.m., at which time his mother told him the police were looking for him. When Detective Rooney told defendant that he had not been to his mother's home until approximately 10:15 a.m., defendant then told him that he went to his sister's house after the disco, fell asleep there for awhile, and, when he awoke, he went to his mother's house.

Rooney next asked defendant if he knew Azalee James. Defendant replied that he did but that he had not seen her for two weeks. After Rooney related to defendant some information he had received from James, defendant stated that in fact he had been en route to James' house earlier that day when he observed a burglary in progress at a residence on Woodlawn. He watched while "property was stashed" and then went to James' house, woke her, and they returned to the scene and took a television which had been among the stashed property. Rooney further testified that when he told defendant that there were two eyewitnesses to the crime, defendant stated that he had in fact been walking with Azalee James past the victims' home, observed a television lying in the bushes near the front of the house, and then took the television. Thereafter, Rooney requested that defendant's fingerprints, which were already on file, be compared with fingerprints taken from a broken basement window of the Williams home.

Chicago police officer Levy P. Roberts testified that on June 8, 1986, at approximately 3:30 p.m., he fingerprinted defendant. Chicago police officer Fred Harris, a trained latent fingerprint examiner of 12 years and called by the State as an expert, testified that he compared defendant's fingerprint with a print taken from the scene of the burglary and found 21 points of identification. In Officer Harris' opinion, the prints were both made by the number 10 finger, or little left finger, of defendant.

After the presentation of the foregoing evidence, the State rested, defendant's motion for a directed verdict was denied, and a conference on jury instructions was held during which an instruction by defendant on eyewitness identification was refused. Thereafter, defense counsel rested without presenting any evidence, closing arguments were made to the jury, and the jury found defendant guilty of residential burglary. Defendant was subsequently sentenced to 25 years' imprisonment, and this appeal followed.

Defendant first argues that his right to confront witnesses against him was violated by the State's substantive use of prejudicial hearsay, i.e., Officer Rooney's testimony concerning "information received

from Azalee James, which prompted him to go immediately to defendant's home." Specifically, defendant complains of the following statements by the State in its opening argument to the jury:

"[THE STATE]: That detective [Officer Rooney] will tell you that after that woman was arrested and brought into the police station she was questioned after having received her Miranda rights. After that conversation with the woman, the woman who was identified as being outside that house, the first thing the detective did was go out and look for Ricky White.

[DEFENSE COUNSEL]: Objection.

THE COURT: I will sustain the objection.

[THE STATE]: You will hear a detective went to Rick White's house. You will hear how the detective did not find Ricky White at home."

Defendant also complains of the State's similar remarks in its closing argument, *i.e.*:

"[THE STATE]: *Just the statement immediately after talking to Azalee, Detective Rooney went directly over to his house, got in the car and sped right over to his house. The information he got from a woman who we know was out in front of that house, and if anybody knows who she was with, don't you think it's clear. After she supplied Detective Rooney with that information, he went directly to his house.*

[DEFENSE COUNSEL]: Objection.

THE COURT: Well, I will sustain the objection to what this woman may have said to Detective Rooney.

[THE STATE]: Ladies and gentlemen, we know that they had a conversation and right after that conversation Detective Rooney wasted no time looking for him.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: When he got him and brought him in, and we know that he sat and tried to squirm his way out of a burglary." (Emphasis added.)

Relying on *People v. Campbell* (1983), 115 Ill. App. 3d 631, defendant also asserts that "this accusation by inference was just as damaging to the defendant as disclosure of the substance of the conversation would have been." The State contends that Officer Rooney's testimony was properly admitted for the limited purpose of explaining his investigatory method.

■■ It is well settled that in cases where officers have testified that they spoke to an accomplice in order to gather information about

others involved in the crime charged, and immediately after that conversation arrested the defendant, such testimony is admissible despite the fact that the jury can reasonably infer therefrom that the accomplice implicated the defendant. (*People v. Hunter* (1984), 124 Ill. App. 3d 516; *People v. Jackson* (1979), 72 Ill. App. 3d 231; *People v. Williams* (1977), 52 Ill. App. 3d 81; *People v. Coleman* (1974), 17 Ill. App. 3d 421.) In the instant case, therefore, we find defendant's assertion without merit that the accusation made through Rooney's testimony implicating defendant in the burglary was just as damaging as disclosure of the substance of Rooney's conversation with James.

■ On the other hand, we agree with defendant that the use made by the State of Rooney's testimony exceeded the limited purpose for which it was admitted, *i.e.*, to explain his investigatory procedure. Analogous to the situation here is, as defendant asserts, *People v. Campbell* (1983), 115 Ill. App. 3d 631. In *Campbell*, the court found that the prosecutors, in defiance of the trial court's explicit instructions, insisted upon repeatedly informing the jury that the defendant's alleged accomplice had implicated the defendant in the crime charged, with the sole purpose to urge the jury to convict the defendant based upon the hearsay statement of the alleged accomplice implicating him. Specifically, the prosecutors remarked during their rebuttal argument that the police *obtained and learned* the defendant's name from his alleged accomplice and, as a result, arrested the defendant. The *Campbell* court reversed the defendant's conviction and remanded the case for a new trial. In the instant case, although the prosecutor did not specifically state that Rooney *obtained and learned* defendant's name from Azalee James as an alleged accomplice in the burglary, his remarks constituted such a statement notwithstanding that it was phrased differently, *i.e.*, "Just the statement immediately after talking to Azalee, Detective Rooney went directly over to his [defendant's] house, got in the car and sped right over to his house. The information he got from a woman who we know was out in front of that house, and if anybody knows who she was with, don't you think it's clear. After she supplied Detective Rooney with that information, he went directly to his house." Clearly the State's remarks here are an example of the recently recognized practice of prosecutors taking improper advantage of the admissibility of testimony by a police officer to explain his investigatory procedure, only to use that testimony, once it is admitted, to impermissibly use it in closing argument. See *People v. Hunter* (1984), 124 Ill. App. 3d 516.

■ Although we find that the complained-of remarks were improper and prejudiced defendant, we do not believe that it can be said

that the jury's verdict would have been different had these remarks not been made in light of the overwhelming evidence of defendant's guilt. (See *People v. Love* (1985), 139 Ill. App. 3d 104.) Two of the victims of the residential burglary identified defendant as the man they saw with one of the items stolen from their home—the black television. A fingerprint found at the burglary scene matched defendant's. Additionally, defendant admitted that he took the television, notwithstanding that he allegedly took it under other circumstances, and that he was with Azalee James when he took it, which was corroborated by the victims' identification of defendant and James by Mrs. Williams and her daughter. "A verdict of guilty will not be set aside on review unless the evidence fails to sustain that verdict, or the evidence is so improbable, unsatisfactory, or inconclusive as not to be worthy of belief." (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 525.) The evidence here clearly supports the jury's verdict.

■■ ■ We also reject defendant's argument that other remarks by the State during closing and rebuttal arguments to the jury were inflammatory and their cumulative impact denied him a fair trial. Where a prosecutor's comments are error, they do not necessarily constitute reversible error. Reversible error occurs only where the comments substantially prejudice the defendant. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590.) A defendant suffers substantial prejudice where the result of his trial would have been different had the improper argument not been made. (*People v. Love* (1985), 139 Ill. App. 3d 104.) A prosecutor is given great latitude in closing argument, and the propriety of his comments are within the trial court's discretion. *People v. Morrison* (1985), 137 Ill. App. 3d 171.

■■ In the instant case, defendant not only complains of comments made by the State in closing argument, but also practically the State's entire rebuttal argument. In light of the fact that the evidence supports the jury's verdict of defendant's guilt, we find it unnecessary to address each complained-of comment. Moreover, our review of the record discloses, as the State contends, that the complained-of comments were either properly based on the evidence or were invited by defense counsel, or, if improper, were harmless beyond a reasonable doubt. For the purpose of illustration, a few of the complained-of comments are as follows. Defendant complains that the State improperly commented on his "intent" when he called the police volunteering to come into the police station, *i.e.*:

> "[THE STATE]: *** He didn't go with Detective Rooney to the station to really admit what he had done, to cleanse his soul, to give in the proceeds. We know why he called. He had it

all figured out. 'I got my alibi. I am all set.'

\* \* \*

Ladies and gentlemen, when he went to the station he had the intent—through the statements we know he had the intent originally of denying any knowledge of this burglary, but when he went to the station he didn't know that they had talked to Azalee. He didn't know they had talked to two eyewitnesses."

We agree with the State that it merely drew reasonable inferences from the evidence in making the foregoing argument based on Detective Rooney's testimony that defendant at first denied any knowledge of the burglary, stating he was somewhere else at the time, but later admitted that he had in fact been at the scene and had taken the television.

We further note that the complained-of comments made by the State that defendant failed to call Azalee James as a witness and that defense counsel lacked expertise concerning the interpretation of fingerprints were in response to defense counsel's closing argument to the jury wherein he attacked the State's failure to call James as a witness and he impugned the State's fingerprint expert's interpretation of the fingerprints of defendant and the one taken from the scene of the burglary.

We also find two other complained-of remarks made by the State, although improper, harmless beyond a reasonable doubt. The complained-of comments were that if the victims had awakened while defendant was burglarizing their home, defendant might have been charged with rape or murder, and another remark suggesting that defendant could have had a gun. Defendant correctly argues that these remarks were prejudicial because there was no evidence of any weapons used in the burglary. However, these remarks were harmless beyond a reasonable doubt, not only because of the overwhelming evidence of defendant's guilt, but also because the court sustained defendant's objection to them and instructed the jury to disregard them.

In light of the foregoing, we find that defendant's right to a fair trial was not violated by the complained-of comments made by the State and that any improper comment was cured by the trial court's prompt sustaining of defendant's objections and its subsequent instructions to the jury to disregard the comments and to consider only the evidence presented.

■ Defendant's last procedural argument is that the trial court erred in failing to give his tendered jury instruction on eyewitness identification. In Illinois, it is well settled that no specific instruction

regarding identification reliability is required to protect a defendant's right to a fair trial where the jury is instructed concerning the credibility of witnesses, the presumption of innocence, and the burden of proof. (*People v. Kubat* (1983), 94 Ill. 2d 437.) Under the circumstances here, the instructions covering these areas were given to the jury. Defendant's argument that his theory of mistaken identity required a special instruction, such as the one proposed by him, is without merit in light of the fact that both Mrs. Williams and her daughter identified him in court as the man they saw walking with their television set and defendant himself admitted he took the television and was at the scene of the crime.

In his final argument, defendant complains that imposition of a 25-year sentence was excessive in light of the fact that there was no weapon involved, there was no harm or threat of harm done to anyone, and that he was only 25 years old at the time.

■ It is well settled that absent an abuse of discretion by the trial court, a sentence may not be altered on review. (*People v. La Pointe* (1981), 88 Ill. 2d 482.) There is no question that the sentence imposed is a severe one, yet it is within the statutory guidelines. Residential burglary is a nonprobational, Class 1 felony providing for a sentence of 4 to 15 years in the penitentiary. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(4).) An extended-term sentence may be imposed if the defendant has been convicted of the same or a greater class felony within 10 years preceding the second conviction. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(1).) In the instant case, defendant had been convicted in 1981 of armed robbery and was sentenced to seven years. Armed robbery is a Class X felony. The 25-year extended term was clearly within the statutory guidelines. In light of the fact that the trial court was in a better position to determine defendant's punishment than this court on a cold review of the record, we cannot say that that court abused its discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

LORENZ and PINCHAM, JJ., concur.