THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMETRICE HUNLEY *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—98—2764, 1—98—3021 cons.

Opinion filed May 1, 2000.

18

Michael J. Pelletier and Frank W. Ralph, both of State Appellate Defender's Office, and Mark W. Solock, both of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Demetrice Hunley and Richard Townsend following a simultaneous jury trial were found guilty of possession of cannabis and cocaine with intent to deliver. Each defendant was sentenced to a 15-year prison term. Hunley argues: (1) the State failed to prove her guilty beyond a reasonable doubt; (2) the trial court erred in denying her motion to suppress evidence; (3) the trial court improperly admitted opinion testimony regarding obtaining fingerprints off plastic; (4) the trial court erred in permitting a police officer to testify about conversations with a citizen; and (5) the trial court erred in not admitting the transcript of a 911 audiotape into evidence and not giving the jury the 911 audiotape and transcript during its deliberations. Townsend only challenges the police testimony regarding fingerprints.

## I. FACTS

On October 2, 1996, at approximately 10:30 p.m., Officer Hasenfang, after receiving information from a person on the street, proceeded to the apartment building at 7315 South Peoria. Hasenfang looked through the window and saw defendants packaging narcotics. Hasenfang radioed this information to his fellow officers. Hasenfang testified that he heard some pounding coming from the front of the house and saw Hunley leave the kitchen. Hunley returned and told Townsend, "Shit, it's the police." Townsend and Hunley filled a child's school bag with drugs. Hasenfang acknowledged at trial that his police report only indicated that Townsend filled up the book bag. Hasenfang saw Townsend lean out the window and try to throw the book bag

onto the roof of the building next door. The bag fell into the gangway. Officer O'Donnell was in the gangway, observed a person dropping an object out the window and recovered the object, a child's book bag containing a large quantity of cocaine and clear plastic bags. Hasenfang, with other officers, entered Hunley's apartment and from the kitchen area recovered cannabis, nine boxes of baggies, four boxes of baking soda, a coffee grinder, and a digital gram scale.

Officer Condreva testified that, after monitoring a radio transmission from Officer Hasenfang, Condreva knocked on the front door of the two-flat apartment building. Condreva saw Hunley look out a second-floor window and ask "[W]ho's there[?]" Condreva responded "[I]t's the police" and asked her to open the door. Hunley told him that she did not believe him, and Condreva showed Hunley his badge. Condreva told Hunley that he was from the Department of Children and Family Services (DCFS) and was checking on Hunley's children because he had a complaint about child abuse. Condreva admitted at trial that his testimony at the motion hearing that he did not tell Hunley he was from DCFS was inaccurate. After Condreva requested Hunley to open the door, Hunley told him that she was dialing 911 and calling the "real police." Condreva encouraged Hunley to call the police. A marked police car arrived, Hunley opened the front door to the apartment building, Condreva and the uniformed police officer entered and Hunley was arrested. In Hunley's apartment Condreva saw three young children and Townsend seated at the dining room table.

Hunley testified that on October 2, 1996, she arrived home around 8:30 p.m. and Jerome, David, Brian and Richard Townsend, together with her three children, were in her apartment. Jerome Townsend was her boyfriend and his nickname was "Doc." She denied seeing any narcotics or drug paraphernalia in the apartment that night or having any knowledge of any such contraband. Jerome, David and Brian Townsend left the apartment, but 17-year-old Richard Townsend stayed. Hunley stated that on October 2, 1996, her back porch window was covered with thick plastic and her back door window was covered with thick plastic, bars and blinds. Hunley explained that she kept the plastic on her windows year round to reduce her landlord's work during the wintertime and that an individual standing on the back porch could not see through the plastic.

At 11 p.m, Hunley heard knocking at her front door and a male at the front door told her to open the door because he was "Doc." After she told him that he was not "Doc," the male told her to let him in because he was "DCFS" and he had a complaint about child abuse. Hunley said she was calling the police. She heard knocking at the back

door and a male voice say "This is Little Red Riding Hood. Open the damn door." Hunley tore some plastic off her back door window, lifted up the blinds, and saw Officer Hasenfang and another man on her porch. Hunley ran to the front and called 911. When Hunley saw uniformed police officers arrive, she went downstairs, opened the front door and the police arrested her. They took her up to her apartment and woke up her children and Richard Townsend. Hunley denied that any drugs were in her kitchen and denied that Richard Townsend tossed a book bag of drugs out the window. She testified that the police officers damaged her furnace and ceiling to reach the attic, where they recovered the drugs and drug paraphernalia that the State was presenting in the trial. Hunley denied knowledge of the contraband in her attic and stated that she never permitted anyone to place it there. Hunley's landlord testified that the furnace area allowed access to the attic. He inspected the furnace area within 48 hours after October 2, 1996, and saw recent damage to the furnace that he had not observed before October 2, 1996.

Hunley and the State stipulated to the authenticity and the foundation for the 911 tape. During Hunley's case in chief, the jury received a transcript of the tape while defense counsel played the 911 tape. The 911 tape confirmed that Hunley called the police. The tape revealed that Officer Condreva identified himself as "DCFS" and told Hunley that he had a complaint about her abusing her children. Hunley told the dispatcher that Condreva was showing his badge and saying that he is the police. Hunley told the dispatcher this individual initially identified himself as "Doc" and she would not come down until the police arrived.

## II. ANALYSIS

### A. Sufficiency of Evidence

▌ Hunley argues the State failed to prove her guilty beyond a reasonable doubt because the State's evidence was unbelievable since Officer Hasenfang could not have seen Hunley and Townsend in her kitchen through the heavy plastic on her back window. Hunley further argues it is improbable that two people would bag cocaine in front of a window or that Hunley would call the police to her apartment if drugs and drug paraphernalia were in her apartment. The standard of review for a defendant's challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 184 Ill. 2d 58 (1998). This standard recognizes that because the trier of fact heard and saw the witnesses, the trier of fact has the

responsibility to judge witness credibility and resolve conflicts in the evidence and inconsistencies in witness testimony. *People v. Coleman*, 301 Ill. App. 3d 37, 42 (1998). "A reviewing court may not override a determination on credibility unless those findings are unreasonable and not based on the evidence." *People v. Diaz*, 297 Ill. App. 3d 362, 369 (1998).

In this case, the jury resolved a credibility dispute. The police officers testified a person on the street directed them to Hunley's apartment. While standing on the back porch, Officer Hasenfang said he saw Hunley and Townsend package drugs and fill up a child's book bag with drugs. Hasenfang then observed Townsend toss the book bag out the window. Officer O'Donnell recovered a substantial amount of drugs from the book bag he saw tossed out the window of Hunley's apartment.

Hunley's testimony directly conflicted with the police testimony. Hunley testified that she and Townsend were not involved in any drug packaging and that she had no knowledge of the drugs in her apartment. Hunley's theory of defense was that she had no knowledge of the drugs and that the police planted the drugs. The jury could have reasonably rejected this theory in light of Hunley's contradictions regarding damage to her front door and who was in her apartment, as well as other inconsistencies in her testimony, together with the conflicting police testimony. The jury is not required to accept Hunley's testimony, but is required to weigh her testimony as it weighs the testimony of the other witnesses. *People v. Ellis*, 269 Ill. App. 3d 784, 789 (1995).

The 911 tape corroborated the police testimony by indicating that Officer Condreva knocked on Hunley's door and attempted to get Hunley to open the door. Officer Condreva never objected to Hunley calling the police and, at one point, encouraged her to call them. Officer Condreva did identify himself as "DCFS" but he also showed Hunley his badge. Hunley also points to the plastic on the back window to discredit Hasenfang. While pictures of the back window from the outside show thick plastic on it, a picture taken from inside the apartment reveals light penetrating the window. There was conflicting evidence regarding the window coverings. Officer Hasenfang testified that he observed a light on in the kitchen, no back porch light, and no plastic on the kitchen window. Hunley acknowledged that there was no back porch light but testified the police broke it and indicated the windows were covered. Hunley's landlord could not recall whether the back porch light was damaged. Again, whether Hasenfang could see through the back window was a credibility question properly resolved by the jury as the trier of fact.

Officer O'Donnell further corroborated Hasenfang's testimony that Hunley and Townsend filled up a child's book bag with drugs and Townsend tossed the bag out the window. O'Donnell recovered the book bag after it was tossed out the window. It was within the province of the jury to weigh Hunley's theory against the police officer testimony and determine whether the police conspired to frame Hunley or Hunley committed the charged offenses. After reviewing the record, we find the outcome of defendant's trial rested squarely on the credibility of the witnesses and this court will not substitute its judgment for that of the jury on that issue. *People v. Furby*, 138 Ill. 2d 434, 455 (1990).

## B. Motion to Suppress Evidence

■ Hunley challenges the denial of her fourth amendment motion to suppress evidence. We review the trial court's ruling under a manifestly erroneous standard because Hunley challenges the credibility of the police testimony and the legal conclusions of the trial court. *People v. Wright*, 183 Ill. 2d 16, 21 (1998). The reviewing court also is not limited to the evidence presented at the suppression hearing but may consider evidence presented at trial. *People v. Sims*, 167 Ill. 2d 483, 500 (1995). Hunley argues that the evidence the police recovered in her apartment should be suppressed as the result of an illegal search and seizure because the police had no authority to enter her back porch or her apartment.

Both the United States and Illinois Constitutions protect individuals against unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6; *People v. Buss*, 187 Ill. 2d 144, 204 (1999). The fourth amendment generally prohibits the police from entering a private residence without a warrant. *People v. Foskey*, 136 Ill. 2d 66, 74 (1990), citing *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). The police, however, are not required to obtain a warrant to enter a home if exigent circumstances exist, and the State bears the burden to demonstrate that exigent circumstances authorized the warrantless entry by the police. *People v. McNeal*, 175 Ill. 2d 335, 344-45 (1997).

The trial court found that Hunley had no reasonable expectation of privacy in a common area of a multi-unit building and that Hasenfang's observations on the porch provided exigent circumstances for the police to enter Hunley's apartment. We first address whether defendant has any expectation of privacy in the backyard of her multi-unit building and on her open porch and whether the police violated this privacy interest. The fourth amendment protects "people, not places." *Katz v. United States*, 389 U.S. 347, 351, 19 L. Ed. 2d 576,

582, 88 S. Ct. 507, 511 (1967). In *California v. Ciraolo*, 476 U.S. 207, 211, 90 L. Ed. 2d 210, 215, 106 S. Ct. 1809, 1811 (1986), the Court adopted Justice Harlan's two-part test for determining whether a person possesses an expectation of privacy in a particular place. The person, first, must have exhibited an actual expectation of privacy in the place searched and, second, the subjective expectation of privacy must be recognized as reasonable by society. *Katz*, 389 U.S. at 361, 19 L. Ed. 2d at 587, 88 S. Ct. at 516 (Harlan, J., concurring).

Applying the *Katz* analysis, the Illinois Supreme Court has found that an individual resident of a multi-unit building does not have a fourth amendment privacy interest in a common area where members of the public are reasonably expected to enter. *People v. Smith*, 152 Ill. 2d 229, 245 (1992). If police deliberately avoid locked areas to enter alleged common areas, that conduct may violate a reasonable expectation of privacy. *Smith*, 152 Ill. 2d at 246. In *Smith*, the court concluded the entrance by police into a common hallway of a multi-unit building did not implicate a fourth amendment privacy interest because officers entered an unlocked, common hallway shared by other tenants and their invitees. *Smith*, 152 Ill. 2d at 245-46.

In this case, the police did not enter a common hallway but entered the common backyard of a two-flat apartment building and Hunley's open back porch. Although Hunley testified that she locked the front gates to the side gangways of her building, police gained entrance to Hunley's back porch, not through the front of the two-flat building, but through the backyard and alley. There is no evidence that entry to the backyard was made inaccessible. Without evidence that entry to the backyard was made inaccessible to passers-by, we do not find that Hunley, a second-floor tenant, possessed a privacy interest against the police using the backyard to gain entrance to the open back porch area. *People v. Schmidt*, 168 Ill. App. 3d 873, 881 (1988) (no recognized privacy interest in garden area of home where defendant took no steps to shield view of garden or prevent entry into garden). Moreover, the record indicates the police did not know the front gates were locked and therefore there is no evidence the police deliberately avoided the locked front gates to gain entry to the common backyard area. Hunley has failed to satisfy the first prong of the two-part test by not exhibiting an actual expectation of privacy in the backyard of this multi-unit apartment building.

With respect to the back porch, we note the porch was open, with no doors, screens or gates securing the back porch or its staircase from the backyard. Both were easily accessible from the backyard. Neither the defendant nor anyone in her family lived on the porch and it was in fact functionally and structurally different and distinct from

the house. Hunley's open and unlocked porch was not part of the physical dimensions of her home. While Hunley may have had a subjective belief of an expectation of privacy on her porch, we believe it is unreasonable to conclude that this privacy interest is similar to the privacy interest one would expect in his or her home. *People v. White*, 117 Ill. 2d 194, 209-10 (1987) (fourth amendment protects a suspect in his or her home by providing "a clearly defined 'zone of privacy,' bounded by 'unambiguous physical dimensions.' [Citation]"). Illinois courts recognize that a suspect possesses a lesser privacy interest in his or her porch than within the confines of the home and such interest implicates lesser fourth amendment protections. *People v. Arias*, 179 Ill. App. 3d 890, 895 (1989).

In *Arias*, the court found that the police did not violate a suspect's fourth amendment rights when they entered the exterior door of a front porch to knock on the front door of the residence to make an arrest. Similarly, in *People v. Greene*, 298 Ill. App. 3d 796 (1997), the police investigated a 911 hang-up call at defendant's residence. The police officers first knocked on the screen door of defendant's porch area and, after receiving no response, peacefully entered the porch area to knock on the inner door. *People v. Greene*, 289 Ill. App. 3d 796, 802-03 (1997). The appellate court found that the officers did not violate defendant's fourth amendment rights because "the officers were justified in making a peaceful entry onto the porch for the purpose of attempting to raise the occupant of the house." *Greene*, 289 Ill. App. 3d at 803.

Like the police in *Arias* and *Greene*, here the police entered the porch in order to conduct a follow-up investigation. After receiving a complaint of serious drug crimes with children in the apartment, the police decided to investigate. Condreva went to the front, and Hasenfang and others went to the rear porch of the apartment. The officers entered both the backyard and open porch peacefully. They did not try to break down the door of Hunley's apartment but entered the porch to conduct an investigation of the complaint. No windows, screens or doors enclosed the second-floor porch; rather, it was completely open. From the porch Hansenfang radioed Condreva that he saw occupants in the kitchen packaging drugs, Condreva then knocked on the front door and attempted to gain peaceful entrance to the apartment. Entry to the apartment was not made through the back door, but through the front door after Hunley opened the front door to the building for the uniformed police. Therefore, the peaceful presence of the police on Hunley's open back porch did not violate her fourth amendment rights.

We must next determine whether the warrantless entry by the po-

lice into Hunley's apartment after her arrest violated Hunley's fourth amendment rights. The Supreme Court of the United States in *Payton* held that the fourth amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton*, 445 U.S. at 576, 63 L. Ed. 2d at 644, 100 S. Ct. at 1374. In *People v. Hassan*, 253 Ill. App. 3d 558 (1993), a police officer, from a place that he had a right to be, observed what he believed to be narcotics inside the defendant's home. The defendant was arrested outside his home and the officer went inside the defendant's home without a warrant and seized the narcotics. On appeal, the court found the police unlawfully entered defendant's home to seize the narcotics. The court stated, "[w]e believe that there was probable cause to believe that a quantity of cocaine was on the premises, but there was no 'emergency' which required a quick response. The officers could have obtained a warrant without the risk that the suspect would escape or harm others. *** In short, *** there was no need for swift action." *Hassan*, 253 Ill. App. 3d at 571.

Hasenfrang saw Hunley and codefendant Townsend in plain view packaging cocaine, and the incriminating nature of this evidence was "immediately apparent." The plain view doctrine is not an independent exception to the warrant requirement and cannot, by itself, allow the police to make a warrantless entry into a home. *Hassan*, 253 Ill. App. 3d at 569. Rather, the police conduct in this case is justified only if exigent circumstances permitted the police to enter Hunley's apartment and make a warrantless seizure of the evidence. Although our supreme court has noted that an exigency analysis should be judged under the totality of circumstances of each case, it has listed some factors to consider, including whether:

> "(1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was [a] reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peacefully, albeit nonconsensually." *McNeal*, 175 Ill. 2d at 345.

Courts have also found exigent circumstances where police are in "hot pursuit" of a suspect who flees from a public place into his residence. *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976). The guiding principle is reasonableness, and each case is evaluated based upon the totality of the circumstances known to the offic-

ers at the time of the warrantless entry. *People v. Yates*, 98 Ill. 2d 502, 515 (1983). "No list of factors bearing on exigent circumstances is exhaustive [citation], and these factors are merely guidelines rather than cardinal maxims to be applied rigidly in each case." *McNeal*, 175 Ill. 2d at 345.

Using these factors as guidelines, we conclude that exigent circumstances permitted the police to make a warrantless entry into Hunley's second-floor apartment. Courts have considered grave crimes to be first degree murder, armed robbery, or assault. *Minnesota v. Carter*, 525 U.S. 83, 142 L. Ed. 2d 373, 119 S. Ct. 469 (1998). This was not a grave crime. There was no evidence that the officers reasonably believed the suspects were armed. It is also clear that there was no unreasonable delay by the police during which a warrant could have been obtained. Rather, the police acted immediately upon observing the packaging of the narcotics in the kitchen and recovering the narcotics-filled book bag tossed by Townsend from Hunley's apartment. Once the uniformed officer who was responding to the 911 call arrived at the apartment building and Hunley opened the door to her apartment building, the officers entered her apartment and seized the remaining contraband. Therefore, despite the nature of the crime and the lack of any evidence that the suspects were armed, the brief period of time between when the police officers obtained probable cause and when they entered the apartment supports the reasonableness of their conduct. *Smith*, 152 Ill. 2d at 250.

Moreover, under the circumstances of this case, there was a reasonable likelihood that evidence could be destroyed, concealed or removed if the police did not make a warrantless entry. In *People v. Ouellette*, 78 Ill. 2d 511, 516 (1979), the supreme court expressly declined to establish a bright-line rule that the easy disposability of drugs creates exigent circumstances when drugs are the subject of the investigation. We are mindful of the fact that where the warrantless entry is motivated by concern that the narcotics will be destroyed, the police "must have particular reasons to believe that the evidence will be destroyed" before exigent circumstances will arise. *People v. Patrick*, 93 Ill. App. 3d 830, 833 (1981). Based on the facts of this case, we believe the police had particular information that reasonably led them to believe that the evidence would be destroyed, concealed or removed before a warrant was obtained. Specifically, the officers saw Townsend, in an effort to remove the drugs, toss a bag of drugs out of the second-floor window of Hunley's apartment. The officers therefore had a reasonable basis to believe that, without immediate entry, the remaining contraband within the apartment could have been destroyed, concealed or removed from the apartment.

Hunley relies on *Hassan* for the proposition that the officers acted improperly when they entered her apartment. In *Hassan,* there was only one defendant and that defendant was arrested prior to the officers' entry. *Hassan,* 253 Ill. App. 3d at 568. In reaching its conclusion, the court noted that no evidence existed that there was anyone else in the residence to destroy the evidence. *Hassan,* 253 Ill. App. 3d at 572. The undisputed fact that Townsend was still in the house when Hunley was arrested in the foyer of her building distinguishes *Hassan* from the facts of this case. Moreover, here, unlike *Hassan,* defendants had already begun to remove the drugs from the apartment.

We note that, before going to Hunley's apartment, the police received information from a person who had just left the apartment indicating that a male and a female were packing "a ton of drugs" in an apartment that contained three little children. Hasenfrang, from the porch, was able to observe a male and female packaging cocaine. Furthermore, when it was apparent to Hunley and codefendant Townsend that they were surrounded by police, they attempted to remove the drugs by hiding them in a child's book bag and tossing the bag out the window. Therefore, before entering Hunley's apartment, Hasenfang witnessed Hunley and Townsend committing a crime and attempting to dispose of evidence, O'Donnell recovered a large amount of narcotics that had been tossed by Townsend from Hunley's apartment, and Hasenfang had information that children were in the apartment. The information from the person who had just left the apartment and the conduct of the defendants, together with the observations made by the police, gave the police clear probable cause. We are mindful of the familiar principle that no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances. In this case, however, the escalating evidence of Hunley's serious criminal activity and the strong probability the drugs would be removed or destroyed as demonstrated by the defendants' attempt to dispose of some of the evidence, together with the legitimate concern for the welfare of the children, produced sufficient exigent circumstances that justified the warrantless entry. Under the facts of this case, in short, there was need for swift action and a quick response.

Consequently, the record supports the conclusion that the police had exigent circumstances to enter Hunley's apartment. Once in Hunley's apartment, the officers lawfully seized the drugs and drug paraphernalia in Hunley's kitchen under the plain view doctrine. To seize an item in plain view, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Horton v. California,* 496 U.S. 128, 136-37, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301,

2308 (1990). Furthermore, the incriminating character of the evidence must be apparent and the police must have probable cause that the evidence is connected to the crime charged. *People v. Jones*, 269 Ill. App. 3d 797, 804 (1994). Here, because exigent circumstances permitted the police to enter Hunley's apartment, the trial court correctly found that the drugs and drug paraphernalia were seized pursuant to the plain view doctrine, because Hasenfang (1) saw them from a place he had the lawful right to be, (2) had a lawful right of access to the drugs and drug paraphernalia, and (3) the incriminating nature of the evidence was apparent. As such, all three requirements of the plain view doctrine have been satisfied.

Hunley additionally challenges the trial court's factual finding that Hasenfang was able to observe the criminal activity in Hunley's kitchen from the porch and that O'Donnell recovered the narcotics from the book bag which Townsend tossed out of Hunley's window. As a reviewing court, however, we will defer to the factual determination of the trial court in judging witness credibility. *People v. Harris*, 297 Ill. App. 3d 1073, 1083 (1998). The trial court found that Townsend did throw the child's book bag out the window and that "Officer Hasenfang did make the observations he said he did from the rear porch." We will not disturb the trial court's findings on the credibility of the police officers. Therefore, based on the totality of the circumstances, we find the trial court's denial of Hunley's motion to suppress was not manifestly erroneous.

## C. Fingerprint Evidence

Both defendants next argue that they were denied a fair trial when O'Donnell testified that he did not submit the evidence to the crime lab for fingerprint analysis because, in his opinion, there was a problem lifting fingerprints from plastic. Defendants contend that O'Donnell offered expert opinion and that he lacked the proper qualifications to give this expert opinion. The trial court has discretion in allowing a witness to testify as an expert and its decision will not be reversed absent an abuse of discretion. *People v. Free*, 94 Ill. 2d 378, 410 (1983).

The State contends that it did not offer O'Donnell's testimony as expert opinion, but offered it to explain his conduct during the course of his investigation. In anticipation of the defendants' attacking the police investigation for failure to submit the evidence for fingerprint analysis the State interjected the issue of O'Donnell's expertise into the trial process by not only asking whether he knew how prints are identified but by asking, "Why is it a problem to fingerprint plastic?" Those questions opened the door to problems concerning lifting

fingerprints from plastic that could only properly be explained by a witness with expertise in the area of fingerprint science. Had the State simply asked why O'Donnell did not submit the evidence to the crime lab for fingerprint analysis and had O'Donnell replied that he chose not to submit the evidence for fingerprint analysis because he did not believe prints could be lifted from plastic, or because he handled the evidence and believed any prints would have been destroyed, we could agree with the State that such an answer would have been properly admissible to explain his conduct during the course of his investigation. However, the State did not ask that question and O'Donnell did not limit his answer to explain his conduct, but instead gave a detailed answer that interjected opinion evidence into the trial process without a proper foundation:

"The State: Why is it a problem to fingerprint plastic?

O'Donnell: What we learned that I recall that only certain materials and surfaces are suitable for obtaining fingerprints. The oils or greases from hands or palms leave an impression on certain substances like wood or hard plastic, something like that. Other substances if you were to put your fingerprint on, you know, glass, the oil would leave an impression, but if the substance was wet or like that instance, if the surface was rough, such as maybe a textured ceiling, something like that, a fingerprint is not going to leave the correct impression. You know, with the plastic, it is flexible, so the plastic—in my opinion, it was handled. Once you touch it, you're distorting—distorting that image, that fingerprint on the item itself. If it was laid out flat and was never, you know, touched in any way, it might—the fingerprint might stay, but like I said, some materials and substances are not—they're not suitable. The fingerprint won't stick. It can't be lifted."

Courts have noted the requirement of expert testimony based on scientific knowledge in the area of fingerprint evidence. *People v. Palmer*, 181 Ill. App. 3d 504, 512 (1989). The jury must be assisted by the testimony of experts in the field of fingerprint identification and comparison. *Palmer*, 181 Ill. App. 3d at 512. " 'The classification and method of comparison of fingerprints is a science requiring specialized study not common to most.' " *Palmer*, 181 Ill. App. 3d at 512, quoting *People v. Rhoden*, 101 Ill. App. 3d 223, 226 (1981). While O'Donnell did not give his opinion as to fingerprint classification or comparison, he did give his opinion as to why it is a problem to fingerprint plastic. He offered his opinion as to what causes fingerprints to occur, his opinion that not every material is suitable for fingerprint analysis, his opinion that on rough or textured material the fingerprint is not going to leave the "correct impression" and his opinion that, because of the problem with some materials, "The fingerprint won't stick. It can't be

lifted." A witness cannot present opinions and purport to guide jurors in resolving questions beyond their common knowledge and experience unless the expertise of the witness is established. *People v. Park*, 72 Ill. 2d 203, 209 (1978).

We recognize that the State contends it did not intend to offer O'Donnell as an expert in the area of fingerprint science, but merely to explain why he did not submit the evidence to the crime lab to test for fingerprints. However, since O'Donnell's testimony as the result of questions by the State interjected opinion testimony regarding fingerprint analysis that went beyond an explanation for his course of conduct in the investigation, the State was required to present a proper foundation and qualify O'Donnell as an expert. A witness may qualify as an expert by providing evidence of the knowledge, skill, experience, or education of the witness. *People v. Miller*, 173 Ill. 2d 167, 186 (1996). The degree of knowledge or experience necessary to qualify the witness as an expert depends on the complexity of the subject matter and the likelihood of error if the witness is not properly qualified. *Park*, 72 Ill. 2d at 209-10. The party offering the expert testimony bears the burden of establishing the expert's qualifications. *Free*, 94 Ill. 2d at 410. In *Park*, the supreme court held that a police officer with only limited experience was not qualified to identify a controlled substance as cannabis. The court reasoned that the officer's personal observations of the substance were prone to error and that scientific tests were available to establish the identity of the substance. The court compared this process with an expert's ability to "draw fine distinctions" between fingerprints and ballistic markings and determined that, in these circumstances, the expert must possess some systematic knowledge of the scientific process. *Park*, 72 Ill. 2d at 211.

O'Donnell's opinion was elicited without establishing the systematic knowledge of the scientific process necessary as a foundation for that opinion. While the trial court admonished the State to lay a proper foundation, the evidence failed to establish that O'Donnell was sufficiently experienced and trained as an expert witness in the field of fingerprint science. O'Donnell only testified that he had "some" classes on fingerprinting at the police academy and that he "essentially" knew how fingerprints were identified. No evidence was presented as to the type of classes that O'Donnell took or what exactly O'Donnell learned about fingerprinting at the police academy. O'Donnell admitted he was not a fingerprint expert. Moreover, by responding to the State's questions about his knowledge of fingerprinting with vague answers such as "essentially" and "to the best of my recollection," O'Donnell demonstrated that he did not have the systematic knowledge necessary to give an opinion regarding fingerprint science.

We conclude that O'Donnell's training at the police academy and limited knowledge in the field of fingerprint science did not sufficiently demonstrate that O'Donnell possessed the knowledge, education, or training to qualify him to render opinions on the science of fingerprinting including possible problems fingerprinting plastic. Therefore, the record lacks the proper foundation to qualify O'Donnell as an expert witness. Without this foundational requirement, the jury was subjected to the opinions of a nonexpert. Moreover, we cannot say the jury was not subjected to the erroneous conclusions of a nonexpert regarding problems fingerprinting plastic. We note numerous cases in Illinois referencing fingerprint evidence obtained from plastic. See *People v. Roppo*, 234 Ill. App. 3d 116, 127 (1992). The jury was told not only why O'Donnell did not seek fingerprint analysis of the plastic bags, but also why, in his opinion, there were problems fingerprinting plastic. Only a qualified expert could answer the State's question: "Why is it a problem to fingerprint plastic?" Therefore, the trial court erred in refusing defendants' motion to strike this testimony and the trial court abused its discretion in allowing O'Donnell to testify about his opinions regarding problems fingerprinting plastic.

The State further argues that, even if the trial court erred in allowing O'Donnell to testify, defendants have failed to demonstrate prejudice by this error. We must determine whether the fact that O'Donnell was permitted to give scientific opinion without being properly qualified significantly influenced the outcome of the trial. Resolution of this case requires the jury to evaluate the credibility of the witnesses. The defendants' fingerprints on the evidence could support the State's case. The defendants claimed that they were unaware of the contraband, that the police recovered it in the attic, and that after the police found it, they framed the defendants by saying that the defendants possessed it. If no prints of either defendant were found, that fact could corroborate the defendants' denials and be used by the defense to raise questions in the jurors' minds as to the reliability of police testimony and police investigation procedures, since the police made no attempt to obtain such evidence.

Officer Hasenfang, in contrast, testified that he saw the defendants package the narcotics in the kitchen and *handle* the plastic bags. The defendants disputed Hasenfang's testimony by presenting evidence that the back windows contained heavy plastic, which Hasenfang could not see through, and impeached Hasenfang with his report, which stated that only Townsend removed the contraband and put it into the child's book bag rather than both defendants as he testified at trial. The discovery of defendants' fingerprints on the plastic bags could have corroborated Hasenfang's testimony. Here, in anticipation of the

defendants attacking the police investigation, the State fronted the issue of the failure of the police to submit the evidence for fingerprint analysis with O'Donnell, who then gave his opinion regarding problems fingerprinting plastic.

The erroneous admission of evidence will not be held reversible if there is no reasonable probability the jury would have acquitted the defendant had the evidence been excluded. *People v. West*, 234 Ill. App. 3d 578 (1992). We do not see how the improper admission of O'Donnell's opinion regarding problems fingerprinting plastic, even if that opinion was erroneous, could have significantly influenced the outcome of the trial. The State can meet its burden of proving defendant guilty beyond a reasonable doubt with the testimony of a single credible eyewitness, "[t]he trier of fact determines what weight to give identification testimony and that determination will not be subject to reversal on appeal 'unless [it is] so contrary to the evidence as to be unjustified.' [Citations.]" *People v. Zarate*, 264 Ill. App. 3d 667, 673-74. When the State offers eyewitness testimony, it is not required to provide additional evidence in the form of fingerprints to substantiate the eyewitnesses because that evidence may only be cumulative. *People v. Hickman*, 9 Ill. App. 3d 601 (1973).

Not only Hasenfang, but Officers Condreva and O'Donnell provided testimony against both defendants. Officer Hasenfang observed defendants in the kitchen packaging the cocaine and radioed this information to other officers. After Officer Condreva received this information, he knocked on the front door and Hasenfang saw defendants hide the cocaine in the book bag. At that point Officer Hasenfang observed Townsend throw the book bag out the window. This was corroborated by Officer O'Donnell, who retrieved the book bag filled with cocaine. Defendants attempted to impeach the identification testimony of Hasenfang regarding his ability to observe the defendants through the windows of the apartment with the testimony of the building manager; however, the building manager was unable to testify that the plastic window coverings were in place over the windows at the time when Hasenfang made his observations. Moreover, these various credibility issues were properly resolved by the trier of fact. *Coleman,* 301 Ill. App. 3d at 42.

Both defendants tried to persuade the jury that they had no knowledge of the contraband and that the police were framing them. The State argued there was sufficient evidence to prove both defendants guilty. The jury agreed with the State. We do not find that O'Donnell's opinion as to problems fingerprinting plastic significantly influenced the outcome of the trial. Based on the totality of the evidence, we find no reasonable probability that the jury would have acquitted the

defendants had O'Donnell's opinion been excluded. While submitting the evidence to fingerprint analysis may have produced results favorable to the defense or the prosecution, we cannot say such results would have been outcome determinative. We note, too, the State made no attempt to exploit the fingerprint testimony of O'Donnell in closing argument, thereby avoiding compounding the error. There was ample evidence from several witnesses to prove both defendants guilty beyond a reasonable doubt. We therefore conclude, based on this record, that the admission of the opinion testimony of Officer O'Donnell was harmless error.

D. Conversation Between Police Officer and Unknown Informant

■ Hunley next argues that the trial court erred in allowing the State to present to the jury contents of the discussion between Hasenfang and the anonymous informant who directed the police to Hunley's apartment. The defendants argued in a motion *in limine* that the content of the conversation was inadmissible hearsay. The trial court granted the motion in part, ruling that the State could not elicit from the police that they were told by the informant that there were children inside the apartment, but it allowed Hasenfang to testify that, following the conversation with the informant, Hasenfang and other officers went to Hunley's apartment because they were concerned about children inside the apartment. At trial, Hasenfang testified that he received an allegation from a person on the street and formulated a plan with other officers because "of the possibility that there were small children in this place I was going to investigate." Defendant contends that Hasenfang should not have been allowed to testify in this manner because such testimony was hearsay.

The rule against hearsay prevents a witness from testifying about an out-of-court statement made to him when such statement is being offered to prove truth of matters asserted therein. *People v. Topps*, 293 Ill. App. 3d 39, 43-44 (1997). A police officer, however, may testify about a conversation that he had with an individual and his actions pursuant to the conversation to establish the officer's investigative process, and such testimony is not hearsay, since it is not being offered for the truth of the matter asserted. *People v. Pryor*, 181 Ill. App. 3d 865, 870 (1989). The police officer may not testify to information beyond what was necessary to explain the officer's actions. *People v. Singletary*, 273 Ill. App. 3d 1076, 1084 (1995). Additionally, the alleged nonhearsay evidence must be relevant to the issues in the case. *People v. Warlick*, 302 Ill. App. 3d 595, 599 (1998). The State may not use the limited investigatory procedure exception to place into evidence the substance of any out-of-court statement that the officer hears during

his investigation, but may only elicit the substance of a conversation to establish the police investigative process. *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993). The supreme court addressed this issue in *People v. Gacho*, 122 Ill. 2d 221, 248 (1988), and held that it was permissible for a police officer to testify that after he spoke to the victim he went to look for the defendant, but indicated that it would have been error to permit the officer to testify to the contents of the conversation.

In this case, the trial court allowed Hasenfang to testify that "they formulated a plan because they were concerned that there may be kids there." To qualify as hearsay, an out-of-court statement must be offered to establish the truth of the matter asserted. *People v. Rogers*, 81 Ill. 2d 571 (1980). Testimony about an out-of-court statement that is used for a purpose other than to prove the truth of the matter asserted in the statement is not "hearsay." *People v. Silagy*, 101 Ill. 2d 147 (1984). Applying these principles, we conclude that Hasenfang's testimony was not hearsay. The challenged testimony was introduced, not to establish the truth of the matter asserted by Hasenfang in his statement, that there were in fact children in the apartment, but to explain to the jury why Officer Hasenfang contacted his fellow officers and proceeded to Hunley's apartment. It was introduced for the limited purpose of explaining what caused the police to act. A police officer may testify about his conversations with others when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer. Since the content of the information was offered to show why the officers proceeded to Hunley's apartment, this statement was admissible under the investigative steps analysis.

In *People v. Warlick*, 302 Ill. App. 3d 595 (1998), the trial judge allowed the police officer to testify that he received a radio call of a burglary in progress and proceeded to investigate. The defendant was charged and convicted of burglary. The appellate court found error in the admission of the radio call because it served no relevant purpose to help the jury decide the issues of the case. The court explained, "[t]here was no issue concerning the officers' reason or motive for going to the recycling center. It simply did not matter. It would have been enough for the officer to testify he received a radio message, then went to the recycling center." *Warlick*, 302 Ill. App. 3d at 600. However, the court in *Warlick*, based on the facts of the case, found the error harmless as it did not significantly influence the outcome of the trial. Unlike *Warlick*, where the statement in issue was "burglary in progress" and the charge was burglary, here, concern for the children did not reference the crimes charged, narcotics violations. Here

the words did not go to "the very essence of the dispute" and there was little or no risk of prejudice to the defendant. *People v. Jones*, 153 Ill. 2d 155, 160 (1992). Had Hasenfang testified to the details of the conversation, that the informant stated he had just left the house at 7315 South Peoria, where there was "tons of dope in the house" that he had been "bagging up" in the house for hours and there were three young children in the house along with a black male and black female, then clearly that testimony would have referenced the crimes charged, would have gone to the very essence of the dispute and would have prejudiced the defendant. However, Hasenfang's testimony was properly limited to explain the next step in his investigation after speaking with the informant.

While we find no error in admitting the limited explanation offered by Hasenfang as to why he went to Hunley's apartment, when there is a question of whether to admit statements explaining steps taken by police in investigating crime, the two-step analysis proposed in *Warlick* should be used. First, the trial judge should determine whether the out-of-court words, offered for some purpose other than their truth, have any relevance to an issue in the case; second, if relevant, then the judge should weigh the relevance of the words for the nonhearsay purpose against the risk of unfair prejudice and possible misuse by the jury. *Warlick*, 302 Ill. App. 3d at 599. In using this analysis, the court should conduct a hearing out of the presence of the jury to determine the relevance of the statement, the scope of the statement, the possible prejudice to defendant and the possible misuse by the jury. *People v. Cameron*, 189 Ill. App. 3d 998 (1989).

A trial judge has discretion in granting a motion *in limine*, and a reviewing court will not reverse a trial court's order allowing or excluding certain evidence unless that discretion was clearly abused. *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996). In order to explain his investigation, Hasenfang only needed to testify that he talked to the citizen informant on the street and that, as a result of that conversation, he and his fellow officers went to Hunley's apartment building. While this is the better approach, for the reasons previously stated we find no abuse of discretion in the trial court's ruling on the motion *in limine*, which allowed Hasenfang to give a limited explanation as to the next step in his investigation.

■ We also reject defendant's argument that the State violated the trial court's order regarding defendant's motion *in limine* during closing arguments. The State argued that "[w]e know that Officer [Hasenfang] was flagged down, he was with his partner [*sic*], they received some information. This information was so disturbing that they had to call an assist unit in with Officer O'Donnell. From there they go to

an address of 7315 South Peoria. They knew there were children there." Defendant objected and the objection was overruled. No limiting instruction was asked for or given, although the jury was instructed that closing argument is not to be considered as evidence.

During closing argument, the State may not improperly use statements admitted to explain police investigatory procedure. *People v. White*, 192 Ill. App. 3d 55, 61 (1989). Therefore, the State commits error in closing argument when it uses such statements beyond what was necessary to explain police conduct. *Singletary*, 273 Ill. App. 3d at 1085. A prosecutor is allowed wide latitude in closing argument, and the propriety of those remarks is within the trial court's discretion. *People v. Morrison*, 137 Ill. App. 3d 171, 184 (1985). Here, the State's closing argument characterizing the information received by Hasenfang as "disturbing" was a reasonable inference that could be made from the evidence. That the police were concerned or disturbed by the information was supported by the testimony. The prosecutor did not argue that an informant told the police that three young children were in the apartment while defendants were packaging a "ton of dope." That statement would have violated the motion *in limine*. Moreover, while it would have been more accurate to say "They were concerned there were children there," rather than "They knew there were children there," we do not find that based on the evidence the substance of that statement rises to the level of prejudicial comment. The words did not go to the essence of the dispute and any error was harmless.

### E. 911 Audiotape and Transcripts

■ Hunley contends that the trial court should have admitted the transcript of the 911 tape into evidence and it should have allowed defendant's request to give the jury both the 911 tape and the transcript of the tape during deliberations. During the defense case a transcript of the tape was published to the jury while the 911 tape was played in open court. The State and defense counsel for Hunley stipulated to the accuracy of the transcript of the tape recording. After the tape was played, the transcripts were collected from the jury. The trial court admitted the tape into evidence with no objection from the State. However, when the State objected to admitting into evidence the transcript of the tape recording, the court refused to admit the transcript into evidence. The trial court did not allow Hunley's request to send the tape and the transcript to the jury room for use by the jury during deliberations but stated that, if the jury requested the tape, it would send the tape back to the jury. The jury did not request the tape or the transcript.

We must first determine whether the court should have admitted the transcript into evidence. A transcript may be admitted into evidence if the party offering it lays a sufficient foundation that establishes the accuracy of the transcript and the identity of the speakers. *People v. Melchor*, 136 Ill. App. 3d 708, 713 (1985). In *People v. Criss*, 307 Ill. App. 3d 888, 899-00 (1999), this court approved the discretionary authority of the trial court to admit transcripts of recordings into evidence and allow the jury to use them during deliberations. Citing our supreme court's decision in *People v. Manning*, 182 Ill. 2d 193 (1998), and decisions from the Seventh Circuit Court of Appeals, the court found that the trial court did not abuse its discretion in admitting the transcripts into evidence and allowing the jury to review them during deliberations. The court, however, cautioned that, when admitting a transcript into evidence, the trial court should provide the jury with a limiting instruction about the appropriate use of the transcript. The jury should be instructed that the transcript only represents what the transcriber believes was said on the tape, it merely serves as an aid when the jury listens to the tape, the tape and not the transcript is evidence, and if the juror perceives a conflict between the tape and the transcript, the tape controls. *Criss*, 307 Ill. App. 3d at 901.

Since the parties stipulated to the accuracy and authenticity of the transcript, there was a sufficient foundation for admitting it into evidence. Moreover, we believe the transcript properly served as an aid to the jury. *Criss*, 307 Ill. App. 3d at 900. Here, the transcript, which neither party contested, provided evidence of what happened at Hunley's apartment. The tape and transcript confirmed that Hunley called the police and requested them to come to her house. The tape and transcript also corroborated Officer Condreva's testimony that he wanted to gain entry to Hunley's apartment, that he identified himself as a police officer, and that he showed Hunley his badge. The admission into evidence of demonstrative evidence is within the sound discretion of the trial court. *People v. Madison*, 264 Ill. App. 3d 481 (1994). The transcript like the tape contained information that was helpful to both the defense and the prosecution. We are mindful that the trial court has discretion as to which evidence should be used by the jury during deliberations. *People v. Manuel*, 294 Ill. App. 3d 113, 126 (1997). We note that the jurors had the benefit of using the transcript while the tape was played in court and made no request to use the transcript during their deliberations. Therefore, based on this record we do not find the failure to admit the transcript into evidence and send it back to the jury during deliberations was an abuse of discretion.

Although the trial court has discretion as to which evidence should be used by the jury during deliberations, audiotapes should not be treated any differently than any other evidentiary exhibits. *People v. Manuel*, 294 Ill. App. 3d 113, 126 (1997). In *Manuel*, the court approved the sending of audiotapes to the jury room because there was a dispute over what was exactly said on the tapes, and "it was appropriate for the jurors to have access to the tapes during deliberations so that they could determine, for themselves, the extent to which the tapes confirmed the State's claim that defendant willingly was involved in the delivery of an illegal substance." *Manuel*, 294 Ill. App. 3d at 126. Here, both parties stipulated to the authenticity and foundation of the tape. Unlike *Manuel*, there was no dispute over the contents of the tape which was played in open court and admitted into evidence with no objection from the State. Like the transcript, the tape contained information that was helpful to both the prosecution and the defense.

The decision of whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court. *People v. Rogers*, 123 Ill. 2d 487 (1988). We note that while the tape was played in court, no request was made by the jury to have the tape played during its deliberation process. Based on the record we cannot say there was an abuse of discretion by the trial court in not sending the 911 tape back to the jury during deliberations.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed; the mittimus for Townsend should be corrected to reflect 653 days' credit for time served, rather than 638 days' credit.

Affirmed.

TULLY and GALLAGHER, JJ., concur.