NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200297-U

NO. 4-20-0297

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| KYLE ALAN BRESTAN, | ) | No. 17CF589 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the State proved defendant guilty of first degree murder beyond a reasonable doubt; (2) the trial court did not abuse its discretion when it refused to send the Report of Postmortem Examination to the jury during deliberations; (3) the court did not abuse its discretion when it admitted text messages between defendant and the victim; and (4) no cumulative error, or in the alternative, trial counsel did not provide ineffective assistance of counsel.

¶ 2    Following a December 2019 trial, a jury found defendant, Kyle Alan Brestan, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)).  The jury found defendant's crime "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."  In June 2020, the trial court sentenced defendant to 60 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court committed plain error in refusing to send the Report of Postmortem Examination to the jury during deliberations, when the report contained the best

evidence of the decedent's time of death, which was a central issue in the case; (3) the court committed plain error in admitting hearsay statements of the decedent, which were heavily relied upon by the State as the only evidence of motive; and (4) cumulative error, or in the alternative, ineffective assistance of counsel. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In May 2017, a McLean County grand jury returned a bill of indictment charging defendant with first degree murder, alleging defendant "knowingly and with the intent to kill, repeatedly stabbed Shannon Hastings, thereby causing the death of Shannon Hastings, and the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty[.]" 720 ILCS 5/9-1(a)(1) (West 2016).

¶ 6                              A. Defendant's Jury Trial

¶ 7        Below, we summarize the relevant testimony elicited during defendant's December 2019 jury trial.

¶ 8        On Tuesday, May 16, 2017, around 12:20 a.m., Juanita Gillispie, a driver for Checker Cab in Bloomington, Illinois, picked up Shannon Hastings and defendant from Fat Jacks Bar located in downtown Bloomington. Defendant placed his bicycle in the trunk of the cab. Gillispie testified that on the way to the intended destination of the Econo Lodge, she stopped at two Circle K convenience stores on Market Street so Hastings could buy lottery tickets. At the second Circle K convenience store, Hastings paid Gillispie, defendant retrieved his bicycle, and Gillispie drove away. Gillispie testified the Econo Lodge was across the street from the second Circle K convenience store.

¶ 9        The State introduced video surveillance taken from the Circle K convenience store located across from the Econo Lodge. The video showed that on May 16, 2017, around 3

a.m., defendant and Hastings entered the store. Angel Thompson, a clerk at the Circle K store, identified Hastings in the video and testified Hastings came into the store multiple times a day to buy lottery tickets and cigarettes.

¶ 10   On Sunday, May 21, 2017, Carl Herrmann, a Econo Lodge maintenance employee, went to check on the occupant of room 136 because the occupant missed 11 a.m. checkout. Herrmann testified that when he arrived at room 136, he unlocked the door and discovered Hastings laying on the floor with "blood all over." Subsequently, Herrmann closed the door and called police.

¶ 11   At 12:30 p.m., Andrew Chambers, a Bloomington police officer, and Charles Casagrande, a Bloomington firefighter paramedic, responded to room 136 at the Econo Lodge. Officer Chambers testified that upon arrival he observed Hastings lying on the floor between the bed and the wall "covered with what appeared to be numerous puncture wounds to her neck [and she was] covered in blood." Paramedic Casagrande checked Hastings's body "for a pulse, determined there was no pulse, and noticed at that time it was very cold and rigor mortis had set in."

¶ 12                              1. *Crime Scene Evidence*

¶ 13   Multiple Bloomington police officers reported to the Econo Lodge to process the scene and collect evidence. Detective Martin Krylowicz observed no evidence of forced entry into room 136. Inside room 136, Detective Krylowicz observed "a substantial amount of blood[.]" Detective Krylowicz viewed blood stains on the bed, around and in the bathroom sink, and on the faucet. Detective Krylowicz testified the blood stains on the bathroom sink "were different from the others. These were more diluted in nature, so that it appeared as if the person was washing their hands and was splashing—some of the stains were like splash stains on the

sink basin and the faucet." Detective Krylowicz discovered personal items on the bed without blood splatter on them, suggesting the items were dumped out later. On various surfaces and items in the room, officers swabbed for deoxyribonucleic acid (DNA) evidence. Police found no latent fingerprints in the room.

¶ 14　　　　Detective Krylowicz observed two garbage cans in the hotel room. Both garbage cans contained garbage, but the garbage can in the bathroom did not have a plastic liner like the other garbage can. Police discovered a soiled condom partially wrapped in tissue in the liner-less bathroom garbage can. Police located a Pall Mall cigarette butt next to the bed frame. Detective Krylowicz discovered the mattress on the bed had been shifted and a knife handle stuck out from under the mattress. Detective Krylowicz observed no bloodlike substance on the knife.

¶ 15　　　　Detective Krylowicz discovered the formation of cobwebs between Hastings's boot and the floor. Police also discovered strands of hair stuck to Hastings's hands. Underneath Hastings's body, police found a silver crack pipe with the word "slime" written in black lettering with a circle around it. Police found no cocaine in the room but discovered a "twisted and knotted up" plastic Baggie. Detective Krylowicz testified torn off edges of a plastic Baggie was "indicative of drug use."

¶ 16　　　　Police recovered multiple cell phones inside room 136. Detective Scott Mathewson testified he swabbed three of the recovered cell phones for DNA evidence and fingerprints. Specifically, Detective Mathewson swabbed (1) a silver Coolpad 3320A, (2) a white Samsung model SM-G550TI, and (3) a black Coolpad 3622A. Detective Mathewson found no recoverable fingerprints on the cell phones. After Detective Mathewson tested the cell phones, he transferred the phones to the cybercrimes unit. Sergeant William Lynn, an expert in

the field of digital forensics, testified he and Detective Josh Swartzentruber performed data extractions on the recovered cell phones.

¶ 17 Bloomington Detective Matthew Dick testified he reviewed the cell phone data extraction reports generated by the cybercrimes unit. Specifically, Detective Dick indicated the reports showed the activity on the cell devices, including phone calls, text messages, instant messages, and web history. The State asked Detective Dick if through his review of the reports, he could locate the last user-generated activity on the silver Coolpad 3320A. Detective Dick began by responding that he would have to look at the report but he believed the last message that was sent on that one was—then defense counsel objected based on hearsay. The State responded it was not asking for content of any messages retrieved from the phone but whether a communication took place. The trial court overruled the objection. Detective Dick then testified the last user-activity generated on that phone was an instant message sent from the phone on April 15, 2017, at 8 p.m., while connected to Econo Lodge's WiFi network.

¶ 18 Detective Dick also testified he reviewed extraction reports from two other devices found in room 136, a black Coolpad 3622A and a white Samsung model SM-G550TI. Detective Dick stated the extraction report of the black Coolpad 3622A showed a May 14, 2017, phone call between the user of the device and a contact listed in the device as "My Bestie Kyle." Detective Dick also testified the extraction reports from both the black Coolpad 3622A and the white Samsung model SM-G550TI showed text message communications in May 2017 between the user of the device and the contact, "My Bestie Kyle," which was associated with defendant's phone number. The State requested a sidebar to discuss objections to the demonstrative exhibits related to the extractions.

¶ 19 Outside the presence of the jury, defense counsel objected based on relevance and hearsay to People's Exhibit Nos. 91 and 92, which contained text messages "purportedly between the defendant and the victim." People's Exhibit No. 91 contained text messages beginning on May 5, 2017, and continuing until May 7, 2017. People's Exhibit No. 92 contained text messages from the evening of May 15, 2017. In response, as to relevance, the State argued the text messages in People's Exhibit No. 91 showed "disagreement and animosity between defendant and the victim" on May 5, 2017, days before Hastings's death. The State argued Hastings's statements were included for completeness and to show their effect on defendant. The State also argued the text messages in People's Exhibit No. 91 showed "a disagreement and conversation about money between" defendant and Hastings that went toward motive. As to People's Exhibit No. 92, the State argued the text messages provided a timeline of the evening of May 15, 2017, into May 16, 2017. As to hearsay, the State argued defendant's statements were not hearsay but rather a statement of a party opponent.

¶ 20 The trial court overruled the objection. As to hearsay, the court agreed with the State and found defendant's statements in the text messages did not constitute hearsay. As to relevance, the court found the conversations in People's Exhibit No. 91, showed "some animosity between the defendant and the alleged victim." The court concluded the text messages were relevant where the conversations "go to intent, motive, completeness in terms of the days and weeks surrounding the alleged event." As to People's Exhibit No. 92, the court determined the text messages were relevant where they "can go to motive, intent, [and] can show disagreement."

¶ 21 Back in the presence of the jury, the State moved to admit People's Exhibit Nos. 91 and 92 for demonstrative purposes, as they contained information from the cell phone

- 6 -

extraction reports that were reformatted into a "cellphone view for aid of presentation[.]" Over objection, the trial court admitted and published the exhibits. Detective Dick then proceeded to testify to the contents of the text messages.

¶ 22        In People's Exhibit No. 91, on May 5, 2017, the user of the device (black Coolpad 3622A) texted "My Bestie Kyle" and "My Bestie Kyle" accused the user of the device of lying and stealing from him. "My Bestie Kyle" repeatedly told the user of the device to stop contacting him. The user of the device indicated a person named "Kenny" was coming soon and that the user of the device would share with "My Bestie Kyle." The user of the device texted "My Bestie Kyle" and said, "My treat." On May 7, 2017, the user of the device texted "My Bestie Kyle," "Well if you still have the [$]25 u were supposed to bring me u can come over with it [and] we will go half [and] half on a half until this 8ball comes." "My Bestie Kyle" responded, "Possibly" and "Not right now." Kenneth Neal testified that in May 2017, he sold Hastings an eight ball of crack cocaine at the hotel off Market Street where she lived. Neal also identified defendant in court as the person Hastings referred to as her "bestie."

¶ 23        In People's Exhibit No. 92, on the evening of May 15, 2017, "My Bestie Kyle" texted the user of the device (white Samsung model SM-G550TI), "What's up?". In response, the user of the device asked "My Bestie Kyle" if he received a check because she needed the money. The user of the device also stated, "I just got a ball broke my hAnd fucking bad bad omg." "My Bestie Kyle" responded he did not receive a check. The user of the device then invited "My Bestie Kyle" over to her room at 8:30 p.m. A while later, "My Bestie Kyle" texted the user of the device, "Where u at?" At 10:16 p.m. on May 15, 2017, the user of the device responded, "Diggers."

¶ 24        Detective Dick testified that after May 16, 2017, after 5:05 a.m., no user-generated activity occurred on any of the cell phones found in room 136. On May 16, 2017, at 3:16 a.m., the white Samsung model SM-G550TI connected to Econo Lodge's WiFi. At 4:52 a.m., the user of the white Samsung model SM-G550TI text messaged Zach Lindrin to meet up at 7 a.m. At 5:05 a.m., the user of the white Samsung model SM-G550TI visited a website and screenshotted an image. Detective Dick testified the website visited was "most likely" Backpages.com, a prostitution website. When reviewing the cell phone devices content, Detective Dick observed several provocative images of Hastings.

¶ 25        Outside of room 136 at the Econo Lodge, Lieutenant Clayton Arnold searched a dumpster on the north side of the hotel. Lieutenant Arnold indicated when he searched the dumpster on Sunday, May 21, 2017, it was less than half full. Inside the dumpster, police discovered a clear plastic garbage can liner that contained "two bath towels, one hand towel, one wash cloth, a pocketknife, an empty package of [Pall Mall] cigarettes, and some cigarette butts." Detective Mathewson testified there was blood on the pocketknife handle and blade. Officers observed brown and red colored stains on the towels. Detective Mathewson and Lieutenant Arnold also searched smaller garbage cans in the common areas of the hotel and found nothing of evidentiary value.

¶ 26                2. *Hastings's Cause of Death and Findings*

¶ 27        Dr. Scott Denton, an expert in the field of forensic pathology, testified that on May 21, 2017, he reported to a hotel room at the Econo Lodge where he observed Hastings deceased with multiple stab wounds to her body. As to the condition of Hastings's body, Dr. Denton testified "rigor mortis is stiffening of the muscles[,]" and he observed mild stiffening of Hastings's elbows but no rigor mortis in her "jaw, her neck and other parts in her wrist." Dr.

Denton stated he pushed on Hastings's arm and easily removed the rigor mortis which indicated she "was coming out of rigor mortis." As to decomposition, Dr. Denton noticed drying of the skin on Hastings's face.

¶ 28 On Monday, May 22, 2017, Dr. Denton performed an autopsy on Hastings. Dr. Denton discovered a substance appearing to be cocaine between two socks on Hastings's right foot. Dr. Denton testified he observed 105 stab wounds to Hastings's neck and chest. Dr. Denton stated, "The ones that are fatal involved—or immediately fatal or very quickly fatal are the ones that involved the jugular vein and the carotid arteries in her neck because that will cause instantaneous rapid bleeding." Dr. Denton testified Hastings's injuries were consistent with the knife found in the dumpster at the Econo Lodge. Dr. Denton determined Hastings died as a result of "multiple stab wounds of the neck and chest."

¶ 29 Dr. Denton generated a Report of Postmortem Examination which detailed his findings and toxicology results. The trial court allowed the State to admit the report into evidence. In the report, Dr. Denton provided that on May 21, 2017, around 3:45 p.m., he arrived at the Econo Lodge and around 4 p.m. he began analyzing Hastings's body and noting his observations. Dr. Denton observed "complete absence of rigor mortis in the jaw, neck[,] and wrists, with minimal rigor mortis in the upper extremities that was easily removed in the right elbow." Dr. Denton noted "prominent orange-brown drying of the lips and drying of the face." Dr. Denton stated Hastings's exposed skin registered a temperature of 67 degrees—room temperature.

¶ 30 In the report, Dr. Denton provided that on May 22, 2017, at 8:10 a.m., he performed Hastings's autopsy where he observed rigor mortis was "completely absent in the joints. Livor mortis is pale, fixed, and posterior. There is green discoloration and drying of the

face, and green discoloration of the abdomen." Dr. Denton observed "strands of thin, dark hair" in Hastings's hands. Dr. Denton preserved the strands of hair on the hands and fingernail clippings for police. Dr. Denton testified Hastings exhibited long, red hair. Dr. Denton stated the hair observed in Hastings's hand "could be blood stained hair." Dr. Denton also performed a sexual assault kit on Hastings. The report listed Hastings's date and time of death as May 21, 2017, at 2:26 p.m.

¶ 31 Dr. Denton testified the toxicology report showed Hastings had a "very high" amount of cocaine metabolic benzoylecgonine in her system—4300 nanograms per milliliter. When asked if that amount of cocaine metabolite would have an impact on the presence of rigor mortis, pooling, or body cooling, Dr. Denton testified the metabolite would not have an impact, but the parent drug cocaine, which caused the presence of metabolite to exist, could "affect things." The toxicology report indicated Hastings had 580 nanograms per milliliter of cocaine in her heart. Dr. Denton categorized the amount of cocaine in Hastings's heart blood as a "moderate" amount. Dr. Denton testified he did not know if the amount of cocaine in Hastings's heart had an impact on rigor mortis, livor mortis, or cooling of the body because he did not know "if it raised her body temperature or not significantly to affect that."

¶ 32 Dr. Denton summarized how he reached his approximation of Hastings's time of death as follows:

"Again, estimation of the time of death is an approximation. So, when I see absence of rigor mortis, with someone with decomposition change that's just a drying, that tells me they're coming out of rigor mortis or rigor mortis has left in the jaw, the wrist muscles. That tells me that the person has been dead

- 10 -

for at least a few days and up to several days. And, specifically, in this context, in—if, if it's—usually, if it's maintained in a room temperature, these findings are consistent to about three to five days a person has been dead."

¶ 33 When asked if his observations were consistent with Hastings dying on May 16, 2017, Dr. Denton responded, "May 16th. So, I saw her on the 21st. I mean, I think I initially said like three to five days. So, the 16th is within that three to five days. So, that's the best I can do." Dr. Denton testified Hastings could have died on May 17 or 18, and that "[t]ime of death is an estimate. And the longer between death and when you find the body, that estimate gets wider."

¶ 34                               3. *Investigation Into Defendant*

¶ 35 Todd McClusky, a sergeant with the Bloomington Police Department, testified that in May 2017 he was the lead investigator on the case. During the investigation, police spoke with two witnesses who alleged they saw Hastings alive after May 16, 2017. Sierra Smith, a cashier at Pilot Travel Center, testified that in May 2017, Hastings regularly came into Pilot to buy scratch-off lottery tickets. Smith spoke with police on May 22, 2017, and she told them she last saw Hastings on Friday, May 19, 2017, at Pilot. Smith testified she saw Hastings around 5:26 p.m., while she was on her break. Smith did not remember telling police she saw Hastings on her break that started at 7:45 p.m. and ended at 8:20 p.m. Smith testified Hastings always wore a teal dress. Police did not locate a teal dress in room 136. Bloomington Police Officer Christian Gallion testified he reviewed surveillance from Pilot and did not see Hastings on video surveillance between May 16, 2017, at midnight to May 19, 2017, at 11:59 p.m.

- 11 -

¶ 36          Shanan Isaacson testified that in May 2017, she lived with her husband in room 132 at the Econo Lodge.  On May 21, 2017, Isaacson told police she last saw Hastings on either Thursday, May 18, 2017, or Friday, May 19, 2017, walking out of her room toward the street.  Hastings's mother testified she spoke with her daughter a couple days after Mother's Day—May 14, 2017.  Police found nothing in room 136 dated after May 16, 2017.

¶ 37          Sergeant McClusky initially investigated numerous potential suspects.  McClusky testified records from the Econo Lodge showed Brian Vincent rented room 136 with cash from May 15, 2017, until May 20, 2017.  Vincent testified that in February 2017, he rented a room for Hastings at the Econo Lodge and at that time, Hastings set up an account.  Vincent testified that in May 2017, he never rented a room at the Econo Lodge.  Sergeant McClusky testified he investigated Braxton Harper, a pimp he was familiar with from his work.  Police found a smashed cell phone belonging to Harper in the courtyard of the Econo Lodge.  Through his investigation, Sergeant McClusky determined that in May 2017, Harper stayed in the room next door to Hastings but noted nothing in Harper's phone connected him to Hastings's murder.

¶ 38          Sergeant McClusky testified text messages and data discovered on one of the cell phones recovered from room 136 led him to interview defendant.  On May 23, 2017, Sergeant McClusky interviewed defendant at the Bloomington Police Department.  The trial court allowed the State to admit and publish defendant's May 23, 2017, video-recorded interview.

¶ 39          During the Tuesday, May 23, 2017, interview, defendant admitted he and Hastings were close friends and he regularly spent time with her.  Defendant told Sergeant McClusky he mainly communicated with Hastings via a text message app and that Hastings had multiple accounts because of her job.  Defendant alluded to Hastings being a prostitute.

Defendant informed Sergeant McClusky that Hastings lived at the Econo Lodge in either room 136 or 138, and they hung out there often.

¶ 40        Defendant told Sergeant McClusky he last saw Hastings on the previous Monday, May 15, 2017, or Tuesday, May 16, 2017. Defendant explained that around 10:30 or 11 p.m., he rode his bicycle to Diggers to meet Hastings, then they walked downtown to Fat Jacks where they eventually got a cab. Defendant stated that Checker Cab took him and Hastings to a gas station across from Econo Lodge, and then they walked back to the Econo Lodge. Defendant estimated they arrived back at the Econo Lodge around 1 a.m. Defendant never denied using cocaine and admitted he used drugs with Hastings. Defendant provided that at some point he and Hastings went back to the gas station and to a truck stop, and then returned to the Econo Lodge. Around 4 or 4:30 a.m., defendant left the Econo Lodge and rode his bicycle home. Defendant told Sergeant McClusky he left when Hastings started receiving calls to meet up with men.

¶ 41        Defendant told Sergeant McClusky he texted Hastings the day after they went out, May 17, but she never responded. Defendant deleted text messages between him and Hastings that occurred prior to May 17. Defendant voluntarily allowed the police to take his DNA, fingerprints, and photographs of his hands and arms. Defendant identified himself in a photograph of him and Hastings entering a convenience store in the early morning hours of May 16, 2017. Defendant told Sergeant McClusky the clothes he wore in the photograph would be at his house but that he had multiple piles of clothes to give away at his house. Defendant gave consent for police to search his phone, and he provided the method of how to unlock his phone.

¶ 42        After defendant's interview, Sergeant McClusky drove defendant home. Defendant, Sergeant McClusky, and Detective Mathewson entered defendant's residence to look

- 13 -

for the shirt, pants, and boots defendant wore in the early morning hours of May 16, 2017. Sergeant McClusky observed piles of clothes everywhere in the basement where defendant lived. Eventually, defendant handed Sergeant McClusky a pair of jeans and boots but was unable to locate the shirt. Sergeant McClusky testified he did not believe defendant gave him the correct jeans.

¶ 43    Detective Krylowicz testified that when he initially took defendant's fingerprints, he noticed a cut on defendant's finger. Detective Krylowicz stated that defendant told him he received the cut when he helped his roommates cut down a tree at his residence and he carried the branches from the tree to the street. Defendant's two roommates both testified that in May 2017, they cut down a tree in their backyard, but defendant did not help.

¶ 44    Sergeant Lynn testified about a data extraction performed on defendant's cell phone. The data extraction showed defendant's cell phone disconnected from the Econo Lodge WiFi on May 16, 2017, at 5:33 a.m. On May 16, 2017, between 5:30 a.m. and 6 a.m., numerous surveillance cameras and public safety cameras recorded defendant riding his bicycle through Bloomington. Sergeant McClusky reviewed photographs and videos obtained from the cameras and observed defendant on his bicycle with dark, brownish red stains on his pants. Sergeant McClusky testified he believed the dark stains on defendant's pants resembled blood.

¶ 45    On May 16, 2017, at 6:01 a.m., defendant's cell phone showed a user-generated web search for "the Bloomington/Normal trash recycling schedule." Sergeant Tim Powers with the Bloomington Police Department testified the public works website defendant searched showed a garbage collection map of Bloomington and how the city breaks up garbage pickup by day and area. Sergeant Powers provided that the city of Bloomington does not pick up commercial garbage, only residential garbage. Sergeant Powers testified one of defendant's

- 14 -

roommates informed him that trash pickup at their residence was on Wednesday, and defendant normally took the garbage out.

¶ 46 Herrmann testified that in May 2017, he could not remember what day of the week the Econo Lodge's dumpster was emptied but he believed garbage was picked up on Friday, not Wednesday. Herrmann also testified garbage pickup may have been once a week or twice a week. Isaacson, a five-and-a-half-year resident of Econo Lodge, testified she was familiar with Econo Lodge's dumpster schedule. Isaacson stated the Econo Lodge dumpster was emptied on "Wednesday sometime between five and 6:30, 7:00 in the morning." Isaacson testified she knew the dumpster schedule because she and her husband finish his paper route around the time the dumpster is emptied. Sergeant Powers testified that in May 2017, he did not know what day of the week Econo Lodge's dumpster was emptied. Sergeant McClusky testified he never contacted the garbage collection company during his investigation to determine the garbage pickup schedule for the Econo Lodge dumpster. Police did not obtain video footage of the dumpster.

¶ 47 On May 25, 2017, Sergeant McClusky interviewed defendant for a second time at the Bloomington Police Department. The trial court allowed the State to admit and publish defendant's May 25, 2017, video-recorded interview.

¶ 48 During the May 25, 2017, interview, defendant told Sergeant McClusky he thought the shirt he wore on May 16, 2017, was in Oswego, Illinois, at his mother's house. Defendant informed Sergeant McClusky he spoke with his mother and described the shirt to her and asked her to set it aside. Also, on May 25, 2017, police spoke to defendant's mother, Sally Brestan, who informed them that she had not seen her son since Christmas 2016. Sergeant McClusky testified the data extraction of defendant's cell phone showed that on May 24

defendant talked to his mother via a text message app but did not discuss clothing in the messages.

¶ 49    Sergeant McClusky testified that during defendant's interview he informed defendant that he saw him on video surveillance with blood on his pants. Defendant never denied the existence of blood on his pants. At the end of the interview, Detective McClusky placed defendant under arrest for Hastings's murder.

¶ 50    On May 25, 2017, and May 26, 2017, Detective Mathewson executed a search warrant at defendant's residence. On the street, in front of defendant's residence, Detective Mathewson found an empty package of Pall Mall cigarettes. Inside defendant's residence, Detective Mathewson observed on defendant's ironing board an Ace bandage wrap and gauze with potential blood stains. Detective Mathewson testified the gauze and bandage wrap were consistent with the bandage one wears after donating blood and plasma. Detective Mathewson also found a crack pipe with the same logo as the pipe found in room 136. Detective Mathewson testified police officers seized and swabbed defendant's bicycle for evidence.

¶ 51    4. *DNA Evidence*

¶ 52    Kevin Zeeb, a forensic biologist with the Illinois State Police, was accepted by the trial court as an expert in forensic biology and testified to his laboratory report findings. Zeeb testified he analyzed Hastings's sexual assault kit and found semen was present but no sperm cells were found. Zeeb also examined the swabs taken from defendant's bicycle and found no blood on the bicycle. Zeeb testified neither the strands of hair found in Hastings's hands nor her fingernail clippings were analyzed due to lack of resources.

¶ 53    Jennifer MacRitchie, a forensic scientist with the Illinois State Police, was accepted by the trial court as an expert in the field of forensic biology and DNA analysis.

MacRitchie testified she conducted DNA testing on multiple items found in the case and presented her findings in a laboratory report. MacRitchie obtained DNA profiles for defendant, Vincent, and Hastings. MacRitchie testified she found Hastings's DNA and a minor DNA profile from an unknown male on the knife found in the Econo Lodge dumpster but excluded defendant and Vincent as DNA contributors. On the knife handle, MacRitchie also found Zeeb's DNA profile.

¶ 54 MacRitchie tested the vaginal swabs from Hastings's sexual assault kit and found the same DNA profile of the unknown male found on the knife was also found on the swabs. MacRitchie excluded defendant and Vincent as contributors of DNA on the vaginal swabs. MacRitchie also tested three samples of stains from a white towel found with the knife. MacRitchie found on two of the samples, defendant's DNA could not be excluded. MacRitchie found Vincent, Hastings, and the DNA profile of the unknown male found on the knife and vaginal swabs contributed to the DNA found on at least one sample from the towel. MacRitchie testified if the white towel came from room 136 and someone washed their hands with the towel, DNA could transfer to the towel.

¶ 55 5. *Sending Forensic Reports Back During Jury Deliberations*

¶ 56 After closing arguments, the parties disagreed as to whether Dr. Denton's Report of Postmortem Examination, MacRitchie's laboratory report, and Zeeb's laboratory report should go back to the jury during deliberations. The State argued the reports should not go back because they were never published to the jury and they contained scientific terminology not necessarily explained to the jury. The State further argued the jury heard the expert witnesses' testimony and did not need the actual reports themselves. Defense counsel argued the expert witnesses' extensive testimony covered the reports and the reports should be treated like all the

other evidence and go back to the jury. The trial court asked the State if there was anything overly prejudicial in the reports, and the State expressed its concern with the administrative date of death listed on the Report of Postmortem Examination because the date was never explained. The court ruled Dr. Denton's Report of Postmortem Examination would not go back to the jury where a couple of matters in the report could be subject to interpretation. The court provided the jury could rely on Dr. Denton's testimony and if they asked to see the report, it would allow them to review it. The court allowed the other two laboratory reports to go back with the jury.

¶ 57                                6. *Jury Verdict*

¶ 58            The jury found defendant guilty of first degree murder. The jury also found defendant's crime "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 59                       B. Posttrial Motion and Sentencing

¶ 60            In December 2019, defendant filed a motion for judgment notwithstanding the verdict or for a new trial. In the motion, defendant argued (1) the State presented insufficient evidence to find defendant guilty beyond a reasonable doubt and (2) the trial court erred in denying defendant's motion *in limine* to bar the use of defendant's prior convictions for impeachment. At a June 2020 hearing, the trial court denied defendant's posttrial motion and held a sentencing hearing. Ultimately, the court sentenced defendant to 60 years' imprisonment.

¶ 61            This appeal followed.

¶ 62                                II. ANALYSIS

¶ 63            On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court committed plain error in refusing to send the Report of Postmortem Examination to the jury during deliberations, when the report contained the best

evidence of the decedent's time of death, which was a central issue in the case; (3) the court committed plain error in admitting hearsay statements of the decedent, which were heavily relied upon by the State as the only evidence of motive; and (4) cumulative error, or in the alternative, ineffective assistance of counsel.  We review each issue in turn.

¶ 64                                    A. Sufficiency of the Evidence

¶ 65          Defendant argues the State failed to prove him guilty beyond a reasonable doubt. The State disagrees and argues it presented sufficient evidence to prove defendant guilty of first degree murder beyond a reasonable doubt.  We agree with the State.

¶ 66          When considering the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt.  *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112.  "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts."  *Id.* "Accordingly, a reviewing court will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses."  *Id.*  "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt."  *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 67          "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged."  *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 536 (2000).  "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances.  It is sufficient if all the evidence taken together satisfies the trier of fact beyond a

- 19 -

reasonable doubt of the defendant's guilt." *Id.* (citing *People v. Jones*, 105 Ill. 2d 342, 350, 475 N.E.2d 832, 835 (1985)).

¶ 68    To prove defendant guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), the State had to establish beyond a reasonable doubt that defendant "knowingly and with the intent to kill," repeatedly stabbed Hastings, causing her death, and the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 69    When we view the evidence in the light most favorable to the State, we conclude any rational trier of fact could have found the required elements of the crime for which defendant was convicted beyond a reasonable doubt. At trial, the evidence revealed that Hastings was found deceased in her room at the Econo Lodge on May 21, 2017, sometime after 11 a.m.

¶ 70    Authorities identified defendant as a suspect after reviewing extractions from the cell phones found in room 136. Specifically, the review revealed that between May 5, 2017, and May 7, 2017, Hastings and her "Bestie Kyle" had a disagreement over drugs, and alleged stealing and lying. The State painted a picture of defendant as someone so aggrieved by Hastings that he attempted to end the friendship and only reconsidered once Hastings acquired drugs and offered to "treat" him. Ultimately, defendant made plans to meet up with Hastings the night of May 15, 2017, after she texted him indicating she "just got a ball."

¶ 71    Video surveillance evidence established defendant as the last person observed in public with Hastings. Defendant admitted being with Hastings until approximately 4 or 4:30 a.m. on May 16, 2017, although cell phone extraction data showed his cell phone disconnected from the WiFi at the Econo Lodge at 5:30 a.m., on May 16, 2017, after the 5:05 a.m. last activity from any device located in Hastings's room when her body was discovered. Also presented to the jury was video surveillance and public safety camera evidence showing defendant riding his

bike, on May 16, 2017, from the Econo Lodge to his home wearing pants covered in dark brownish red stains.

¶ 72          The State presented evidence regarding numerous questionable actions taken by defendant that, when considered with the other evidence in the case, allowed the jury to find defendant guilty beyond a reasonable doubt. Defendant admitted deleting all text messages between him and Hastings except for one sent from his phone after he left the Econo Lodge on May 16, 2017. On May 16, 2017, following his departure from the Econo Lodge, defendant's cell phone showed a user-generated web search for "the Bloomington/Normal trash recycling schedule." According to defendant's roommate, trash pickup at their residence was on Wednesday and defendant normally took the garbage out. When questioned about a cut on his finger, defendant explained he cut himself while helping his roommates cut down a tree and carrying branches from the tree to the street. However, his roommates indicated defendant did not help with the tree. When asked to turn over the clothing he wore when with Hastings on May 16, 2017, defendant indicated the shirt was at his mother's residence in Oswego, Illinois, and that he spoke with her and asked her to set it aside. When police spoke to defendant's mother, she indicated she had not seen defendant since Christmas 2016. A May 24, 2017, text message conversation between defendant and his mother revealed no discussion about clothing. Defendant never turned over the shirt he wore on May 16, 2017, and officers suspected the jeans defendant did provide were not the jeans he wore on May 16, 2017.

¶ 73          Defendant contends multiple pieces of evidence show reasonable doubt as to his guilt. First, defendant asserts Dr. Denton's three to five day approximation of Hastings's time of death fell after the morning of May 16, 2017, when defendant was last with Hastings. Second, defendant asserts the presence of the murder weapon in the Econo Lodge's dumpster on May 21,

2017, proves Hastings was killed after May 16, 2017, because the dumpster would have been emptied before May 21, 2017. Further, defendant asserts multiple witnesses saw Hastings alive or spoke to Hastings after May 16, 2017. Third, defendant argues his DNA was not found on the murder weapon. Last, defendant argues the State failed to pursue forensic evidence—Hastings's fingernail clippings and strands of hair found in Hastings's hands—that could have identified the actual murderer beyond a reasonable doubt.

¶ 74　　　　Defendant attempts to narrow Dr. Denton's approximation of Hastings's time of death down to the hour. In estimating Hastings's time of death, Denton specifically stated his estimation was just that—an estimate. When asked whether a date of death of May 16, 2017, was consistent with his findings, Denton indicated May 16, 2017, fell within his estimate. The jury heard extensive evidence regarding the condition of the body and factors involved in estimating time of death. When called upon to decide whether defendant murdered Hastings, the jury obviously rejected defendant's theory regarding when Hastings was murdered. Here, as the fact finder, the jury was presented with sufficient evidence, including expert testimony, to allow it to accept the State's theory regarding Hastings's time of death.

¶ 75　　　　The presence of the murder weapon in the Econo Lodge's dumpster on May 21, 2017, did not require the jury to find Hastings's murder took place after defendant left Hastings. Although the murder weapon was undeniably placed in the dumpster at some point prior to when it was found on May 21, 2017, the evidence failed to establish exactly when the murder weapon was placed in the dumpster. While multiple witnesses testified to their opinion of Econo Lodge's May 2017 dumpster pickup schedule, no one testified they observed the dumpster being emptied between May 16, 2017, and May 21, 2017. Thus, exactly when the murder weapon was placed in the dumpster remained an open question. Importantly, the State was not required to

prove when the murder weapon was placed in the dumpster in order to prove defendant guilty beyond a reasonable doubt. As to the unknown male DNA found on the murder weapon, a towel, and the vaginal swab, all within the tied garbage can liner, and the absence of defendant's DNA on the murder weapon, the State offered expert testimony regarding the high variability of DNA transfer and possible DNA degradation. In conjunction with the DNA evidence, the jury was aware Hastings worked as a prostitute and that defendant could not be excluded from the major DNA profile found on a stain on a white towel found inside the tied garbage bag.

¶ 76        Even though there were reports of sightings of Hastings after May 16, 2017, these sightings were investigated and could not be independently verified. Hastings's alleged conversation with her mother a couple of days after Mother's Day fails to change our view. Such an equivocal estimate as to when the conversation took place fails to show the jury was unreasonable in declining to accept defendant's position that Hastings was murdered after he left her. The jury also knew about fingernail clippings from Hastings and hair found in her hands. In not having these items tested, the State certainly risked the jury deciding the unexamined evidence raised a reasonable doubt as to defendant's guilt. However, that evidence and the State's failure to examine the evidence was simply an additional consideration for the jury in reaching a verdict. The failure to examine is not in and of itself necessarily enough to overcome the evidence as a whole which supports the jury's verdict. When we consider the totality of the evidence, we conclude the evidence presented was sufficient to sustain a guilty verdict. Finally, where the evidence demonstrated Hastings bled to death after being subjected to repeated stabbing in her neck and chest including her right jugular vein and her carotid artery, the exceptional brutality indicative of wanton cruelty involved in Hastings's murder is obvious.

¶ 77 Under the circumstances, the jury was in the best position to assess the credibility of the witnesses, weigh the evidence, and resolve any conflict or inconsistencies in the evidence. See *Bradford*, 2016 IL 118674, ¶ 12. Accordingly, we find the jury, acting as a rational trier of fact, reasonably found defendant guilty of first degree murder beyond a reasonable doubt and the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 78                    B.  Sending Forensic Reports Back to the Jury

¶ 79 Defendant next argues the trial court committed plain error in refusing to send the Report of Postmortem Examination to the jury during deliberations, when the report contained the best evidence of the decedent's time of death, which was a central issue in the case. The State argues no clear error occurred where the trial court did not abuse its discretion when it declined to send the Report of Postmortem Examination back to the jury during deliberations. We agree with the State.

¶ 80 To preserve an error for consideration on appeal, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Failure to do so constitutes forfeiture. *Id.* However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain error doctrine, defendant must first demonstrate a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If an error occurred, we only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness

of the evidence." *Id.* Defendant forfeited this issue on appeal where he failed to raise the issue in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48. Thus, we turn to whether a clear or obvious error occurred.

¶ 81　　　　" 'The decision whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court.' " *People v. White*, 2011 IL App (1st) 092852, ¶ 59, 963 N.E.2d 994 (quoting *People v. McDonald*, 329 Ill. App. 3d 938, 947, 769 N.E.2d 1008, 1016 (2002)). "We will not reverse that decision unless there is an abuse of discretion to the prejudice of the defendant." *McDonald*, 329 Ill. App. 3d at 948 (citing *People v. Hunley*, 313 Ill. App. 3d 16, 37-38, 728 N.E.2d 1183, 1203 (2000)). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1, 5 (2009).

¶ 82　　　　Defendant argues the trial court abused its discretion when it allowed the two laboratory reports to go back to the jury but not Dr. Denton's Report of Postmortem Examination. Defendant asserts that by not allowing Dr. Denton's report to go back to the jury, the jury based its verdict on a misunderstanding of Hastings's time of death. Defendant contends Dr. Denton's report provided crucial information, not testified to by Dr. Denton, such as Hastings's time of death where the report was the only piece of evidence that provided the specific times Dr. Denton examined Hastings's body. The report provided that on May 21, 2017, around 3:45 p.m., Dr. Denton arrived at the Econo Lodge and at 4 p.m., he observed Hastings deceased with multiple stab wounds to her body. Defendant argues the time Dr. Denton examined Hastings's body was a vital detail needed for calculation of the time of death where the three to five day approximation of time of death would have excluded defendant by half a day.

Specifically, defendant argues Dr. Denton's approximation that Hastings died three to five days prior to his observations would have placed time of death on May 16, 2017, at 4 p.m., at the earliest.

¶ 83        Further, defendant argues the trial court also demonstrated a misunderstanding of Hastings's time of death when it ruled on defendant's posttrial motion. In denying defendant's posttrial motion as to defendant's challenge to the sufficiency of the evidence, the court stated, "We have a medical examiner, Dr. Denton, who testified to his opinion regarding time of death. And he had it at approximately the same time as May 16th, approximately 5 a.m., in terms of what his opinion was with regard to death."

¶ 84        The State argues the trial court did not abuse its discretion when it declined to send Dr. Denton's report back to the jury during deliberations where the report contained information and medical terminology not explained by Dr. Denton. The State asserts facts contained in the report not testified to by Dr. Denton would invite speculation by the jury. The State also contends the jury did not need to review the report where they heard Dr. Denton's testimony as to the findings in his report. The State distinguishes the laboratory reports from Dr. Denton's report by arguing both Zeeb and MacRitchie testified to the contaminated and inconclusive DNA analysis in the laboratory reports.

¶ 85        Further, the State asserts Dr. Denton testified to the findings in his report and was subject to cross-examination. Based on his observations, Dr. Denton approximated Hastings's death occurred three to five days prior to May 21, 2017. The State asserts Dr. Denton's time of death was an estimation based on days, not hours, and that May 16 fell within the range of the estimate. Moreover, the State asserts the trial court was not confused regarding time of death

where May 16, 2017, at 5 a.m., fell within the three to five day estimate.  We agree with the State.

¶ 86    Based on the evidence, we find the trial court did not abuse its discretion in refusing to send Dr. Denton's report back to the jury during deliberations where Dr. Denton testified to the findings in his report and his observations of Hastings's body on May 21, 2017, and May 22, 2017.  Dr. Denton testified Hastings's death occurred three to five days prior to May 21, 2017, which included May 16, 2017.  Dr. Denton never testified his approximation of Hastings's time of death was based on hours.  Dr. Denton also provided his approximation of Hastings's time of death was an estimate.  Further, Dr. Denton was cross-examined regarding his time of death approximation and findings.

¶ 87    Moreover, the trial court ruled that if the jury asked to see the report, it would allow them to review it.  We note the jury made no request to review Dr. Denton's report during its deliberation process.  Accordingly, we find the trial court did not abuse its discretion when it refused to send Dr. Denton's Report of Postmortem Examination back to the jury during deliberations.  Thus, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 88                                    C.  Hearsay

¶ 89    Defendant next argues the trial court committed plain error in admitting hearsay statements of the decedent, which were heavily relied upon by the State as the only evidence of motive.  The State argues no clear error occurred where the trial court did not abuse its discretion when it admitted text messages between Hastings and defendant.  The State asserts the text messages did not constitute hearsay where Hastings's and defendant's statements were not offered for the truth of the matter asserted.  Defendant forfeited this issue on appeal where he

failed to raise the issue in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48. Thus, we turn to whether a clear or obvious error occurred.

¶ 90            The parties initially disagree as to our standard of review. Defendant contends we should review *de novo* the trial court's decision to admit hearsay evidence where the court admitted the evidence based on the misapplication of the doctrine of completeness. The State, however, contends we should review the trial court's decision to admit the text messages for an abuse of discretion. The State argues the trial court's decision to admit the text messages was not made in isolation but made on the specific circumstances of the case and not on a broadly applicable rule. See *People v. Caffey*, 205 Ill. 2d 52, 89-90, 792 N.E.2d 1163, 1188 (2001). We agree with the State.

¶ 91            We find the trial court's decision to admit the text messages was not made in isolation where the court did not base its decision on the doctrine of completeness. Rather, the court analyzed the text messages and found defendant's statements in the text messages did not constitute hearsay. Further, the court concluded the text messages showed "some animosity between the defendant and the alleged victim." The court determined both Hastings's and defendant's text messages were relevant where the conversations "go to intent, motive, completeness in terms of the days and weeks surrounding the alleged event." Thus, we review the trial court's admission of the text messages for an abuse of discretion. As stated above, we will find an abuse of discretion only where the court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Patrick*, 233 Ill. 2d at 68.

¶ 92            Generally, hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). However, not all out-of-court

statements are inadmissible hearsay. *People v. Buffman*, 260 Ill. App. 3d 505, 511, 636 N.E.2d

783, 788 (1994). Only those statements offered to prove the truth or falsity of the matter

contained therein are subject to the hearsay rule. *Id.* "[A]n out-of-court statement offered to

prove its effect on a listener's mind or to show why the listener subsequently acted as he did is

not hearsay and is admissible." *People v. Gonzalez*, 379 Ill. App. 3d 941, 954, 884 N.E.2d 228,

239 (2008) (citing *People v. Thomas*, 296 Ill. App. 3d 489, 499, 694 N.E.2d 1068, 1075 (1998)).

Further, Illinois Rule of Evidence 801(d)(2)(A) (eff. Oct. 15, 2015) provides that a statement is

not hearsay if the statement is offered against a party and is "the party's own statement, in either

an individual or a representative capacity."

¶ 93    Our review of the record shows Hastings's statements in the text messages were

not hearsay because they were not offered to prove the truth of the matter asserted, *i.e.*, that

Hastings had drugs. Rather, Hastings's statements were offered to show their effect on

defendant and explain defendant's subsequent actions in connecting with Hastings. The

statements provide an explanation as to why on the evening of May 15, 2017, defendant met up

with Hastings and went back with Hastings to her room at the Econo Lodge. We also find

defendant's statements in the text messages were not hearsay, as they were statements of a party

opponent. Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015).

¶ 94    Accordingly, we find the trial court did not abuse its discretion when it admitted

the text messages between defendant and Hastings. Thus, defendant fails to demonstrate a clear

or obvious error occurred to support his contention of plain error.

¶ 95                              D. Cumulative Error

¶ 96    Last, defendant argues he was denied a fair trial by the cumulative effect of the

errors that took place at his trial. Because the trial court did not err when it (1) refused to send

Dr. Denton's Report of Postmortem Examination back to the jury during deliberations or (2) admitted the text messages between defendant and Hastings, we decline to address any cumulative error claim.

¶ 97        In the alternative, defendant argues trial counsel rendered ineffective assistance by failing to preserve the two issues raised above in a posttrial motion. To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 98        Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. Here, because the trial court did not abuse its discretion when it (1) refused to send Dr. Denton's Report of Postmortem Examination back to the jury during deliberations or (2) admitted the text message between defendant and Hastings, we conclude defendant's ineffective assistance claim fails where he cannot demonstrate counsel's performance was deficient under the *Strickland* analysis.

¶ 99                                III. CONCLUSION

¶ 100        For the reasons stated, we affirm the trial court's judgment.

¶ 101        Affirmed.